706 N.E.2d 123 (1999)
In re C.L.T., T.P.T., and B.N.T., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
K.M., Respondent-Appellant).
No. 5-97-0984.
Appellate Court of Illinois, Fifth District.
February 4, 1999.
*124 Curtis L. Blood, Collinsville, for Appellant.
William Haine, State's Attorney, Madison County, Edwardsville, Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Gerry R. Arnold, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, Mt. Vernon, for Appellee.
Justice MAAG delivered the opinion of the court:
This case is an interlocutory appeal of right from the final judgment of the circuit *125 court of Madison County, terminating the parental rights of respondent K.M. (the mother), with respect to three of her minor children. The parental rights of B.T. (the father) were also terminated; however, this appeal is only on behalf of the mother. No questions are raised on the pleadings, and the mother filed a timely notice of appeal.
The mother contends that the evidence does not sustain the findings of the circuit court that she was an unfit parent. We disagree for the following reasons.
In the circuit court, a finding of parental unfitness must be proved by clear and convincing evidence. In re Pronger, 118 Ill.2d 512, 526, 115 Ill.Dec. 390, 517 N.E.2d 1076, 1081 (1987). The circuit court's finding will not be reversed, however, unless it is against the manifest weight of the evidence, since that court had the opportunity to see the witnesses and evaluate their credibility. In re J.P., 261 Ill.App.3d 165, 174, 198 Ill. Dec. 565, 633 N.E.2d 27, 34 (1994). For a finding to be against the manifest weight of the evidence, the "opposite result must be clearly evident from a review of the evidence." J.P., 261 Ill.App.3d at 174, 198 Ill. Dec. 565, 633 N.E.2d at 34.
The circuit court's finding is entitled to great deference. J.P., 261 Ill.App.3d at 174, 198 Ill.Dec. 565, 633 N.E.2d at 34. It is not the function of this court to reweigh the evidence or to reassess the credibility of the witnesses. In re I.D., 205 Ill.App.3d 543, 550, 151 Ill.Dec. 94, 563 N.E.2d 1200, 1205 (1990). "Each case concerning parental unfitness is sui generis, unique unto itself." In re Adoption of Syck, 138 Ill.2d 255, 279, 149 Ill.Dec. 710, 562 N.E.2d 174, 185 (1990). We must be mindful that a finding of parental unfitness may be based on evidence sufficient to support any one statutory ground, even if the evidence is not sufficient to support other grounds alleged. In re J.A.S., 255 Ill.App.3d 822, 825, 194 Ill.Dec. 433, 627 N.E.2d 770, 772 (1994).
In the case at bar, the petition to terminate parental rights alleged that the mother was an unfit person for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare and (2) demonstrating habitual addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness hearing.
Pursuant to the Adoption Act (750 ILCS 50/0.01 et seq. (West 1996)), one of the grounds of unfitness is the "failure to maintain a reasonable degree of interest, concern[,] or responsibility as to the child's welfare." 750 ILCS 50/1D(b) (West 1996). Since the language of section 1D(b) is in the disjunctive, any of the three grounds identified thereinthe failure to maintain a reasonable degree of interest or concern or responsibility as to the welfare of the minors may be established as a basis for unfitness. See J.P., 261 Ill.App.3d at 174, 198 Ill.Dec. 565, 633 N.E.2d at 34.
This case commenced on October 18, 1995, with the State filing petitions to adjudicate the minors T.T., C.T., and B.T. neglected. Specifically, all of the petitions alleged that T.T. was a newborn whose blood or urine contained cocaine and that the mother was not providing him with the proper or necessary support, education, or medical or other remedial care recognized under State law as necessary for his well-being. All of the petitions also alleged that the minors' mother has a substance abuse addiction which inhibits her ability to provide adequate care and supervision for the three children.
On November 16, 1995, the circuit court entered an order for continuance under supervision and ordered as follows: (1) that the parents cooperate fully with the Department of Children and Family Services (Department) and Family First, (2) that the parents cooperate with and successfully complete any parenting lab arranged for them by the Department, (3) that the mother undergo and successfully complete evaluation and recommended treatment for drug addiction or alcoholism as arranged by the Department, and (4) that the parents allow the Department access to their home for the purpose of monitoring this order.
On February 5, 1996, the State filed a petition to revoke supervision because Family First could not locate the parents on five *126 attempts in one week. On February 28, 1996, the court revoked supervision by agreement, found the minors neglected, and placed them in the custody of the mother, whom the court again ordered to cooperate with the Department, attend parenting classes, complete drug treatment, allow the Department home access, and tell the Department where she lives at all times.
On March 6, 1996, the State filed supplemental petitions seeking adjudications of neglect, adding the ground that the parents left the minors with a relative without making arrangements for their care. Although the mother was previously pro se, she submitted an affidavit of indigence and the court appointed an attorney to represent her. That same day, the circuit court held a shelter care hearing and found probable cause to believe that the minors were neglected as alleged in the supplemental petition. B.T., the father, was present and was also represented by an attorney.
On October 25, 1996, a petition to terminate parental rights as to all three minors was filed. The petition stated that B.T. admitted paternity and was, at that time, residing at the Madison County jail. The petition also stated that the mother was residing at the St. Clair County jail. The petition also alleged that C.T.'s father was C.H., who was, on the date of the petition, residing at the federal correctional institution in Memphis, Tennessee.
The allegations contained in paragraph seven of the petition state that the mother was unfit for the following reasons: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors and (2) she has demonstrated habitual addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding. The petition also alleged that B.T. and C.H. were unfit fathers.
The mother denied the allegations of paragraph seven.
On March 19, 1997, a hearing was held on the petition to terminate the mother's parental rights. The mother failed to appear and her attorney requested a continuance. The attorney told the court that her client received some devastating news that day from a case worker, and counsel stated, "[A]pparently this has caused here [sic] to be unable to attend Court." Then, the following colloquy between the mother's attorney and the trial judge was as follows:
"THE COURT: Miss Robins, let me put you on the spot. You said `apparently'. Do you know that is the reason she is not here, or are you just guessing?
MS. ROBBINS [the mother's attorney]: I don't know. I only know from talking to the case worker and the conversation that the case worker had, but I am assuming that the State will put the case worker on to flush out what actually happened today."
At the time, Ruth Meyer, a Department case worker, was called to the witness stand. Meyer testified that she had been the case worker for the mother's children since January or February of 1996. Meyer stated that she had seen the mother at 12:40 p.m. that very day and that they had spoken to one another. Meyer testified that she had gone to the mother's residence to explain that the mother's baby was very sick. Meyer then testified as follows:
"A. [Meyer] I had knocked for ten minutes [at the mother's residence], and I was hearing movement inside and no answer. So I finally knocked loudly and screamed, "your baby is dying, answer the door", in order to get her to answer the door for me.
THE COURT: You told her that?
A. I screamed that, yes; "your baby is dying, answer the door".
THE COURT: Is her baby dying?
A. Yes. She answered the door * * * and I advised her of the child having RSV virus and that she was in critical condition, had been since Thursday, and the condition had worsened today, and they had given her paralyzing drugs and upped the dosage of the respirator and did not know. It was touch and go.
Q. Did you have any discussions with her about coming to Court today?
A. Yes, I did.

*127 Q. What was the substance of that conversation?
A. I stated, `Do you know that you've got a court hearing today?' She said, `Huh? I don't have a ride.' I said, `I'll give you a ride now.' She said, `No, my sister will give me a ride.' I said, `Are you sure?' She said, `Yes.'
Q. Did she indicate at any time [that] she intended to go to the hospital to see her child prior to coming to Court or in place of coming to Court?
A. No, she did not indicate that.
Q. When was the child born?
A. February 1st of 1997.
Q. And during that time has the child been in good health, or has there been continuing problems with its health?
A. The child* * * [the mother] received no prenatal care and showed up at St. Elizabeth's Hospital in Granite City two days before birth. Her water was leaking, and they rushed her to St. Mary's Hospital in Clayton. She left against medical advice. Two days later she showed up at St. Elizabeth's Hospital again and she the foot of the baby was hanging out of her vagina and all the water had come out, so it was a dry birth then. They were able the baby was able to be born alive, so there was [sic] some complications from that, but there was [sic] none fromshe stabilized, was released from the hospital on February 10th, until last Thursday when she had to return because of the virus."
When asked whether the mother "kept in regular contact and visited the child" while the child was in the hospital, Meyer stated that although the mother had "some" contact with the child, she did not have regular contact with her. When asked if the mother had visited the infant in its most recent hospitalization, Meyer replied that the mother had not and that she did not even know what hospital the child was in. On cross-examination, Meyer was asked how the mother responded when she was told how gravely ill her infant was. Meyer testified: "She was non[ ]expressive. She stated what I said, [and] didn't scream or cry * * *."
The court denied the mother's motion to continue. The court stated, however, that if the mother could produce proof from hospital medical staff that she was actually at the hospital from 1 p.m. through 2:30 p.m. on the date of the hearing, the order would be vacated.
Meyer was the witness that the State called regarding the grounds for the termination of parental rights. Meyer stated that the Department required the mother to obtain a drug and alcohol assessment, follow through on the recommendations, complete a parenting class, visit the children once a week or more often as she progressed in the service plan, and communicate to the Department regarding her whereabouts.
The mother had the assessment on November 19, 1996. The recommendation was "intensive out-patient services." Although the mother was supposed to attend four or five sessions a week, she only attended three sessions from November 20 through the month of December, and she attended seven sessions in February. Hence, she did not successfully complete that program. The mother attended only one of six parenting classes, and at the point of the completion of the class, she could not be located. Periodically, the Department still did not know of the mother's whereabouts, and later it discovered that she was incarcerated in the Madison County jail, the St. Clair County jail, and the St. Charles, Missouri, jail. In March of 1996, the mother visited the children three times. In April of 1996, she visited them only once. After that visit, the mother did not see her children until August of 1996. In August, she visited them twice. She saw them twice in October of 1996, twice in November of 1996, once in January of 1997, and three times in February of 1997, with the last visit occurring on February 21, 1997. Meyer stated that the visits averaged only one per month, whereas the Department requested that she visit with them once a week.
Subsequent to Meyer's testimony, the circuit court determined that the State met its burden of proof, and the court granted the petition for termination.
*128 It is clear that the mother failed to complete any of the tasks. A review of the record shows that the mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors. Anyone that is not "unfit", as defined by the Adoption Act, would have worked to complete those very reasonable tasks in order to show her interest in, her concern about, and her responsibility for the welfare of her children.
Although the mother would now like this court to believe that her failure to complete many of the required tasks was due to her financial condition or to her lack of access to transportation or to the distance she would have had to travel, we decline to accept this as an excuse for her failure to complete every task, for the following reasons. First, there was absolutely no evidence that she informed the Department that she would be unable to visit the minors because of her financial condition, because of any lack of access to transportation, or because of any great distance to where the children were staying. Moreover, she did not make any such claims during the termination proceedings. In fact, her attorney never even asked Meyer whether those circumstances existed.
Although any one of the following demonstrated that the mother was an "unfit" parent, her failure to follow the juvenile court's orders to cooperate with the Department as to visitation of the minors, to complete parenting classes, to complete treatment for any drug or alcohol problems, and to keep the Department informed of her whereabouts evidenced her failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors. These facts, coupled with the fact that she failed to appear for the termination hearing when she clearly had two alternative forms of transportation that day, show that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors. Hence, the finding by the court that the State proved the allegation of unfitness was not against the manifest weight of the evidence.
Since a finding of parental unfitness may be based on evidence sufficient to support any one statutory ground, even if the evidence is not sufficient to support other grounds alleged, we need not address the issue of whether the State met its burden of proving the other grounds alleged in the petition.
Next, the mother claims that the court deprived her of due process of law by proceeding in her absence with the hearing on the petition to terminate her parental rights.
The mother was served with a summons on December 31, 1996, directing her to appear on February 5, 1997, for a hearing on the petition to terminate her parental rights. On February 5, an order was entered continuing the termination hearing and directing that notice be mailed. The hearing was subsequently scheduled for March 19, and she failed to appear for the hearing. As we already stated, Meyer saw the mother approximately 2½ hours prior to the hearing to explain the medical condition of the mother's infant and offered the mother transportation to the hearing that very day. She declined the offer and told Meyer that her sister could give her a ride. Despite the fact that her infant was in critical condition, she did not indicate to Meyer that she intended to go to the hospital to see the infant. In fact, she had not been to visit with the infant for approximately one week. Meyer stated that when the mother was told how serious her infant's medical condition was, she was "non[]expressive".
The mother's attorney moved for a continuance due to the circumstances involving the mother's infant. However, the mother's attorney admitted that she had no reason to believe that the mother was actually at the hospital visiting the infant. The court denied the motion for a continuance but stated that it would vacate the order if, within seven days, the mother could produce independent evidence of hospital medical personnel that she was actually at the hospital when she was scheduled to be in court. The mother never presented such evidence, even at the hearing on her posttrial motion.
*129 Due process requires adequate notice to the minor's parents in a juvenile proceeding. In re J.P.J., 109 Ill.2d 129, 134, 92 Ill.Dec. 802, 485 N.E.2d 848, 850 (1985). Pursuant to section 2-16(4) of the Juvenile Court Act of 1987 (705 ILCS 405/2-16(4) (West 1996)), once service of the petition has properly been made, a change in the date of the hearing on the petition requires notice by certified mail "or other reasonable means" to each respondent who was served with a summons personally. Although we recognize that a parent has the right to be present at a hearing to terminate parental rights, it is not mandatory that she be present, and the trial judge is not obligated to wait until she chooses to appear. In re Interest of Williams, 36 Ill.App.3d 917, 921, 344 N.E.2d 745, 748 (1976).
A review of the record shows that the mother was served with a summons for the petition to terminate parental rights. On the date scheduled, the hearing was continued to another date and the court ordered that notice be mailed. Neither the mother nor her attorney ever claimed that the mother did not receive notice of the new hearing date. Hence, the mother had notice of the hearing.
Regardless, even if she had not received notice by mail, her counsel was aware of the date and appeared at the proper date and time. The mother had a duty to follow the progress of her case and to learn from her attorney the date of the next hearing. Tiller v. Semonis, 263 Ill.App.3d 653, 657, 200 Ill.Dec. 233, 635 N.E.2d 572, 574 (1994). Notice to counsel would be one method of providing the notice by "other reasonable means" that section 2-16(4) contemplates.
Moreover, we know that the mother had actual notice of the termination-of-parental-rights hearing at least 2½ hours prior to the hearing because Meyer testified that she personally reminded her of the hearing. It is apparent to this court that the mother never intended to go to the hearing. When Meyer asked the mother if she knew that she had a court date on that particular day she said, "Huh? I don't have a ride." Meyer told her that she would give her a ride, and the mother replied, "No, my sister will give me a ride." Meyer even went so far as to ask her if she was sure, and the mother replied in the affirmative.
It is within the juvenile court's discretion whether to grant or deny a motion for a continuance. In re K.S., 203 Ill.App.3d 586, 596, 148 Ill.Dec. 682, 560 N.E.2d 1380, 1386 (1990). It is clear in the instant case that the mother had notice of the hearing but, nonetheless, failed to appear. Additionally, she did not go to the hospital to see her infant and made no attempt to prove that she was at the hospital at the time of the hearing. Under such circumstances as those present in the instant case, we cannot say that the juvenile court abused its discretion when it denied the motion for a continuance.
Since the mother was given notice of the hearing date and voluntarily failed to appear, since she failed to provide evidence that she was at the hospital, and since she was represented by counsel at the hearing, her right to due process was not denied when the hearing proceeded in her absence.
Finally, the mother claims that this case should be remanded for a hearing concerning the best interests of the children because, after finding her unfit, the juvenile court failed to conduct a separate hearing into the best interests of the children prior to ordering the termination of her parental rights. We agree.
Although it is true that the mother has waived this issue by failing to object at the time of the hearing, waiver is a limitation on the parties, not this court. The Illinois Supreme Court has clearly stated that a single hearing consolidating the issues of unfitness and best interests carries a risk of prejudice. Syck, 138 Ill.2d at 275-76, 149 Ill.Dec. 710, 562 N.E.2d at 184. Likewise, in In re A.P., 277 Ill.App.3d 593, 599-600, 660 N.E.2d 1006, 1012, this court stated that the question of what is in the best interests of the child should not be treated lightly. "A separate hearing and determination of the child's best interests is mandatory in order to ensure the proper focus on those interests. That need not be a lengthy or burdensome process, as the fitness and best interest hearings may be held one right after the other *130 with an unfitness determination necessary before going forward." (Emphasis added.) Accord In re J.T.C., 273 Ill.App.3d 193, 199-200, 209 Ill.Dec. 881, 652 N.E.2d 421, 426 (1995); In re V.S., 285 Ill.App.3d 372, 375, 220 Ill.Dec. 894, 674 N.E.2d 437, 439 (1996).
Since it is clear in the instant case that there was no hearing regarding the best interests of the children, that portion of the trial court's order finding the mother to be an unfit parent is affirmed, the termination of her parental rights is reversed, and the cause is remanded for further proceedings.
Affirmed in part and reversed in part; cause remanded.
RARICK, P.J., and KUEHN, J., concur.