NOTICE

Decision filed 03/26/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200349-U

NOS. 5-20-0349, 5-20-0350, 5-20-0351 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in he limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* M.H., O.H., and M.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 17-JA-51, 17-JA-52, & |
| | ) | 17-JA-53 |
| v. | ) | |
| | ) | |
| Michele H., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's determinations that Father was unfit and that termination of his parental rights was in the minors' best interests were not contrary to the manifest weight of the evidence. The trial court's denial of Father's motion to continue the best-interest hearing was not an abuse of discretion and did not violate Father's right to due process. The trial court's docket entry setting forth the basis for the termination of Father's parental right satisfied the writing requirement of 705 ILCS 405/2-27(1) (West 2018).

¶ 2     Respondent, Michele H. (Father), appeals the judgment of the circuit court of Marion County terminating his parental rights to his three minor children, O.H., M.H., and M.H. For the following reasons, we affirm.

1

¶ 3　O.H., M.H., and M.H. are the biological children of Father and Misty C. (Mother), who is not a party to this appeal. O.H. was born on July 14, 2009, and M.H. and M.H. are twins born on January 31, 2011. In July 2015, the children were removed from Mother's care based upon allegations of neglect by Mother due to her substance abuse. Mother successfully completed services, and the children were returned to her care in December 2016, and the safety plan was ended in June 2017.

¶ 4　On November 23, 2017, while Father was incarcerated, Mother was arrested for methamphetamine possession. On December 7, 2017, the State filed a petition for adjudication of wardship for each of the children alleging the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2016)), in that their environment was injurious to their welfare. The petitions alleged that Mother's drug use prevented her from periodically caring for the minors, but that the minors were not currently in protective custody.

¶ 5　At a status hearing on January 10, 2018, Father appeared and reported that the children were living with he and Mother. The court ordered Father to take a drug test, which Father agreed to do. At the next hearing, on January 17, 2018, the caseworker reported that Father did not take a drug test as ordered on January 10, 2018. The caseworker stated that Father had taken a drug test that morning, and that the results were negative but the sample was "dilute, clear as water." The court noted that a dilute test was "as good as a positive test 99 percent of the time" and indicated that it would conduct a hearing on a rule to show cause against Father for failing to obey the court's order at the next status hearing.

¶ 6    At the next hearing, on January 31, 2018, Father was present with his attorney. Father's counsel advised the court that Father did not report to the probation office on January 10, 2018, for the drug test because Father did not want to be arrested on an active warrant from Clay County for driving on a revoked license. The court found Father in contempt for violating the court order. The court ordered Father to immediately submit to another drug test. After a recess, the probation officer reported that Father tested positive for methamphetamine, cocaine, and benzodiazepines. Mother then submitted to a drug test, which returned positive for methamphetamine. The State made an oral motion for emergency shelter care based on the parents' positive drug tests.

¶ 7    At the hearing, the caseworker testified that the Illinois Department of Children and Family Services (DCFS) had opened the case a couple of months earlier based on allegations of substance abuse by Mother. The caseworker testified she was conducting weekly home visits and that Mother had been referred to psychiatric and counseling services, which she had begun attending. The caseworker stated that Father was offered substance abuse services, but he indicated that he did not need or want these services. The trial court found there was probable cause to believe the children were neglected as defined by the Act, and DCFS was granted temporary custody of the children. Following the hearing, Father was taken into custody on the outstanding Clay County warrant.

¶ 8    On February 8, 2018, the State filed an amended petition for adjudication of wardship for each of the minors, again alleging the minors were neglected pursuant to section 2-3(1)(b) of the Act, in that their environment was injurious to their welfare. In

separate paragraphs, the amended petitions alleged that Mother's and Father's drug use periodically prevented them from caring for the minors.

¶ 9    On March 7, 2018, the court conducted an adjudicatory hearing on the neglect petitions. At the hearing, Mother and Father admitted to the allegations of neglect based on Mother's drug use. The court granted the State's petitions and adjudicated the children neglected, finding the minors were in an environment that was injurious to their welfare based on Mother's admitted drug use. On April 18, 2018, Father was arrested for failing to appear in court in Clay County on his charge of driving on a revoked license.

¶ 10    On May 2, 2018, the court conducted the dispositional hearing. Father, who was in the custody of the Clay County jail, was present. Mother and Father agreed to the entry of a dispositional order temporarily placing custody and guardianship of the minors with DCFS. That day, the court entered dispositional orders finding that Mother and Father were unable to care for the children, and that it was in the best interests of the minors that they be removed from their parents' custody. The court adjudicated the children wards of the court and granted DCFS guardianship and custody of the children.

¶ 11    During a September 2018 permanency hearing, Father's counsel reported that Father had pled guilty to felony driving with a revoked license in St. Clair County and Clay County and was currently in the Illinois Department of Corrections (DOC). On June 3, 2019, Father was released from DOC. At a permanency hearing on June 19, 2019, Father's counsel reported that Father had called her office that morning and reported that he was having car troubles. Father did not appear at the hearing, but Father's counsel reported that

4

Father was attempting to secure housing and employment, and to obtain records of the services he completed while in DOC.

¶ 12   On July 24, 2019, the caseworker filed a status report with the court. The caseworker reported that Father indicated he had been working and living with a friend since his release from prison on June 3, 2019, but that Father would not provide information about his employer or the address where he was living. Father had also not signed the necessary releases so that the caseworker could access Father's record, including any records regarding services Father reportedly completed while incarcerated. Father was calling the minors and was participating in visits with the minors. The caseworker noted that Father sometimes had to be redirected while interacting with the minors because he was "making promises that are not a possibility." During a visit on July 12, 2019, when out of earshot of the case aide supervising the visit, Father told the minors that the caseworker hated him and was keeping the minors from him, and that they were going to be taken away from their foster parents and returned to him. One of the minors was particularly upset by Father's actions, and the minors reported the conversation to their foster parents.

¶ 13   On November 27, 2019, the caseworker filed a permanency report with the court. The caseworker reported that Father still had not signed the necessary releases, so she was unable to verify his claims that he had completed some services while incarcerated. The caseworker reported that Father needed to complete another substance abuse assessment and mental health assessment, and that he needed to attend another parenting class due to his continued substance abuse and lack of cooperation with the caseworker. The report indicated that Father had submitted to drug testing and received negative test results on

July 30, 2019, August 8, 2019, and October 21, 2019. Father testified positive for methamphetamines or amphetamines on September 6, 2019. Father failed to appear for scheduled drug testing on September 25, 2019, October 8, 2019, November 4, 2019, and November 20, 2019.

¶ 14    The November 27, 2019, report also indicated that when Father was questioned about the July 12, 2019, incident with the minors, Father denied any knowledge of the conversation and called the children "liars." The caseworker advised Father that future visits would end if Father talked to the children about the case or spoke negatively about anyone involved in the case. The report indicated that during a visit on August 21, 2019, Father told the minors that the caseworker and the foster parents were preventing him from talking to them or seeing them, and the visit was immediately ended. Father had a visit with the minors on September 3, 2019, with no issues. Father's scheduled visits with the minors were cancelled after Father was a no call/no show for his visit on September 11, 2019, and failed to confirm his visits on October 2, 2019, and October 9, 2019. The caseworker reported that she attempted to reach Father seven times between September 24, 2019, and October 1, 2019, to inform him of required drug tests and to confirm a visit but Father did not respond. The caseworker reported that she had attempted to contact him several times to schedule visits with the minors, conduct a home visit, and to inform Father of drug tests but that Father had not responded since October 27, 2019. On December 5, 2019, the guardian *ad litem* (GAL) filed a petition to temporarily suspend Father's visitation, alleging Father's visits with the children were detrimental to their welfare based on reports of the Father's conduct during supervised visits.

¶ 15    On December 10, 2019, the State filed petitions to terminate Mother's and Father's parental rights to the children. The petitions alleged that Father was unfit based on three statutory grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors (750 ILCS 50/1(D)(b) (West 2018)); (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect, specifically between March 8, 2018, and December 8, 2018, or March 10, 2019, and December 10, 2019 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) failure to make reasonable progress toward the return of the minors to him during any nine-month period following the adjudication of neglect, specifically between March 8, 2018, and December 8, 2018, or March 10, 2019, and December 10, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 16    On December 11, 2019, the court conducted a permanency hearing and a hearing on the motion to terminate Father's visitation. The GAL reported that Father had been arrested in Madison County and charged with possession of methamphetamine on November 25, 2019. The court granted the GAL's motion to suspend Father's visits over Father's objection.

¶ 17    On March 11, 2020, the court held a fitness hearing, at which Mother and Father were present. At the hearing, the State introduced into evidence four service plans created by DCFS for Father. The initial service plan was created in January 2018, and the plan was evaluated and updated every six months. Each service plan contained the same

7

recommended tasks for Father, which included tasks and services in the areas of substance abuse, mental health, parenting, and cooperation with DCFS.

¶ 18    Caseworker Courtney Schnake testified she managed the case from March 2018 through August 2018. When she was assigned the case, the children were already in DCFS care and the first service plan was already in place. The service plan recommended that Father complete a substance abuse assessment and any recommended treatment, complete a mental health assessment and any recommended treatment, attend parenting classes, and cooperate with DCFS. Although Father had signed the necessary releases in cooperation with DCFS, Father's overall performance was rated as unsatisfactory because he had not engaged in the required assessments and recommended services. When Schnake evaluated Father's performance in July 2018, Father was incarcerated in the St. Clair County jail, having been charged with driving on a suspended or revoked license. Schnake testified that Father did not complete any of the recommended services in the plan, but acknowledged that she could not order drug tests while he was incarcerated and that she did not confirm whether Father completed any services while incarcerated.

¶ 19    Caseworker Christine Leathers testified she had been the assigned caseworker since December 10, 2018. Leathers confirmed that Father's recommended tasks remained the same throughout the case and with each new service plan. Again, Father's recommended tasks were substance abuse services, mental health services, parenting classes, and cooperation with DCFS. Leathers testified Father did not successfully complete any of his recommended tasks, and that he failed to make progress on the service plans.

8

¶ 20    In January 2019, Father's overall performance on his second service plan was rated as unsatisfactory in all areas. Although Father had signed releases for information, Leathers noted that she was not able to effectively rate Father's cooperation with DCFS as successful due to Father's incarceration. Leathers reported that Father did not appear under the influence of controlled substances during visits with the children, but rated Father's overall performance related to his substance abuse issues as unsatisfactory because he had not engaged in substance abuse counseling and could not submit to random testing due to his incarceration. Leathers rated Father's performance of the remaining tasks as unsatisfactory because Father had not received a mental health assessment or sought any mental health counseling, and he had not completed parenting classes.

¶ 21    Father was released from DOC on June 3, 2019. In July 2019, Leathers reevaluated the service plan and rated Father's overall performance under his third service plan as unsatisfactory. The service plan indicated that Father met the goal of not being under the influence during visits with the children but he had not provided proof that he had completed any substance abuse services with an agency-approved provider. The service plan also indicated that Father had not completed a mental health assessment with an agency-approved service provider and had not engaged in parenting classes. Although Father had been keeping his appointments, Father's overall cooperation with DCFS was rated as unsuccessful because he had failed to sign all of the necessary releases and failed to keep DCFS informed of his employment, contact information, and address. The plan indicated that Father advised Leathers that he would not provide her with the name of who he was living with or his address because it was "not anyone's business." Leathers testified

9

that when she evaluated Father's compliance under the third service plan in July 2019, the evaluation found that Father had not completed any of his recommended tasks. Leathers testified that she became aware sometime after Father's release from DOC that he had completed a parenting class while incarcerated. Leathers testified she did not receive any paperwork suggesting that Father completed a mental health assessment.

¶ 22    On January 10, 2020, Father's overall performance on his fourth and final service plan, covering the period from July 2019 through January 2020 was rated by Leathers as unsatisfactory based on his failure to successfully complete any of the recommended tasks. Leathers rated Father's cooperation with DCFS as unsatisfactory based on Father's failure to sign all of the necessary releases for information, his refusal to provide verification of his employment and residency, his failure to respond to phone calls or messages, and his failure to make all of his appointments or to call to cancel them. Leathers testified that while Father had signed the necessary releases for information early in the proceeding, he failed to sign new ones after those had lapsed. Although Father provided some documentation verifying the programs he completed while in prison, Leathers stated she was not able to obtain the necessary documentation from DOC to confirm his participation without the proper releases. Leathers also testified that DCFS provided Father with transportation to the visits with his children but that there were two instances where Father was a no call/no show for his visits when the case aide arrived to pick him up.

¶ 23    Leathers stated that Father completed a parenting class while he was incarcerated but that Father failed to demonstrate progress in this area, as evidenced by his repeated inappropriate interactions with the children. Leathers testified that DCFS recommended

Father take another parenting class, which he failed to do. Leathers also reported that Father failed to complete a mental health assessment or to participate in mental health counseling despite being referred to three different service providers.

¶ 24 With regard to substance abuse services, Leathers rated Father unsatisfactory overall. Leathers testified that Father was incarcerated between August 8, 2018, and June 3, 2019, and was unable to participate in random drug screens. Leathers reported that Father tested positive for controlled substances twice during the pendency of the case, on January 31, 2018, and September 6, 2019, and that he failed to appear for testing four times between September 25, 2019, and November 20, 2019.

¶ 25 Leathers explained that Father had completed a substance abuse assessment on June 7, 2019, several days after he was released from DOC, and received an assessment that no substance abuse treatment was necessary. Leathers testified this was not a "compliant assessment" because Father did not provide accurate information during the evaluation. Leathers stated that Father reported to the evaluator that he had been abstinent from all substances for at least seven years, which was not truthful. Leathers concluded that Father had not successfully completed treatment or remained substance-free, as recommended.

¶ 26 Father testified he was incarcerated from April 2018 until June 3, 2019. Father acknowledged that he received copies of some of the service plans, and that he knew he should do the recommended tasks under the plans. Father testified that he had completed every task under the service plans. Father stated he had completed five substance abuse evaluations since the initiation of the case, four while incarcerated and another after his release, and that no treatment was ever recommended because "everyone says he doesn't

11

have a problem." With regard to the substance abuse evaluation completed in June 2019, Father acknowledged telling the evaluator that he had abstained from all substances for at least seven years but asserted that he also advised the evaluator about his failed drug test in January 2018, and that she still found no treatment was necessary. Father testified that he completed a substance abuse course in April 2019, while he was incarcerated, and asserted that he had been compliant with drug testing. When asked whether the September 6, 2019, test was positive for methamphetamine or amphetamines, Father stated only, "That is what they say." Father testified he failed to appear for drug tests on September 25, 2019, October 8, 2019, November 4, 2019, and November 20, 2019, because he did not receive notice that the tests were scheduled because someone "hacked" his cellular phone account. Father also testified the caseworker texted him the information about the scheduled drug tests even though he told her to either leave him a message or mail him information because his phone was broken, and he does not "read texts all of the time."

¶ 27    Father also testified that he had completed multiple mental health evaluations while incarcerated, and another on June 7, 2019, at "B and I" in St. Louis. Father testified that every evaluation concluded that no treatment was necessary, so he did not see any reason to have another evaluation completed. Father testified that his paperwork proving that he completed the June 7, 2019, evaluation was outside "in the car."

¶ 28    Father testified he completed a parenting class in May 2019, while he was incarcerated, and that he emailed copies of all of his paperwork proving his compliance to the caseworker. Father testified he wrote and called the children while incarcerated, and

12

that he visited them after he was released. When asked if he missed visits or failed to call or show for visits, Father responded, "So they say."

¶ 29    On March 30, 2020, the court entered an order finding the State had proven by clear and convincing evidence that Father was an unfit person for failing to make reasonable progress toward the return of the minors in any nine-month period following the adjudication of neglect. The court found Father did not complete most of the services recommended in his service plans, and that he clearly demonstrated a need for substance abuse treatment and mental health counseling, but that he did not take these services seriously.

¶ 30    On June 1, 2020, the court set the best-interest hearing for July 15, 2020. Notice of the hearing was sent to Father and his attorney. On July 13, 2020, upon the State's uncontested motion, the court reset the hearing for August 12, 2020. On August 11, 2020, upon Mother's motion to continue, the court reset the best-interest hearing for September 30, 2020.

¶ 31    On September 30, 2020, the court called the case for the best-interest hearing. Mother and Father were not present. Mother's attorney reported that Mother was in DOC and that no writ had been issued to transport her to court that day. Mother's counsel made a motion to continue her portion of the proceeding. The State and GAL had no objection to Mother's motion but requested to proceed with Father's portion of the hearing.

¶ 32    Father's attorney joined in the motion to continue. Father's counsel reported that she had sent Father notice of the hearing by email but was not aware of whether he received notice by mail. Counsel stated it was "possible there was an oversight" and argued that it

13

would make sense to conduct the best-interest hearings for both parents at the same time. The court granted Mother's motion to continue but denied Father's motion. The court found Father was not in custody, was present at the last hearing, and that the clerk had sent Father notice of the initial hearing date. The court found that even though the date of the hearing had been continued, Father was aware that the hearing was pending. The court also found that Father's counsel had attempted to contact Father but that Father had not communicated with his counsel despite his ability to do so.

¶ 33    The court proceeded to the best-interest hearing with regard to Father, and heard testimony from the children's foster parents, Jill L. and Mark L., who were the minors' great-aunt and great-uncle. Jill testified that the minors had been living with the foster parents for a little over two years, and that they had developed a close aunt-niece relationship. Jill stated the minors were doing well in school, were involved in activities, and were attending counseling. Jill testified she loves the children and wants them to remain a part of her life. Jill stated she would like to be granted guardianship of the minors because the minors wished to be reunited with their Mother, in the hope that Mother will be rehabilitated by her incarceration. Jill testified that if the parents' parental rights were terminated, she would like to adopt the minors. Jill testified that Father had not seen or had any contact with the minors in a year, and that he had not contributed to their care. Jill testified the minors have expressed that they did not want to see or live with Father.

¶ 34    Mark testified he loved the minors like his own children, that the children have been incorporated into the family, and that he and Jill's grown children refer to the minors as their sisters. Mark testified they were willing to adopt the minors and give them a home if

14

the parents' parental rights were terminated. Mark stated Father has not contributed to the minors' care, and that they have not seen or heard from Father in a year. Mark testified the minors have stated that they do not want to be returned to Father.

¶ 35    The court issued a verbal ruling finding that it was in the children's best interests that Father's parental rights be terminated. The court found that the children were happy and well cared for in their foster home. The court found that the foster parents offered the children permanency, in that Mark was unequivocal that he loved the children, and he would adopt them if he were able. The court found that the children did not wish to see Father, and that Father's visits with the children were terminated due to his behavior and Father never sought to remedy the situation.

¶ 36    In a docket entry from the day of the hearing, the court stated that it denied Father's motion to continue because Father was sent notice of the original hearing date, was aware that the best-interest hearing was imminent, and was sent electronic notice of the new hearing date from his attorney. The court also found that it was in the best interests of the minors that Father's parental rights be terminated. The court found that the children were well cared for with the foster parents, and that the foster father testified that he loved them like his own children. The court found the foster parents were willing to adopt the minors. The court also found that the minors had not had contact with Father and that they did not wish to have contact with Father. This appeal follows.

¶ 37                                        ANALYSIS

¶ 38    Prior to discussing respondent's contentions on appeal, we briefly address the timeliness of our decision. This case has been designated as accelerated pursuant to Illinois

15

Supreme Court Rule 311 (eff. July 1, 2018). Rule 311(a)(5) provides, in part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The 150-day deadline expired on March 22, 2021. In this case, Father requested two extensions of time to file his opening brief, and oral argument was held on March 23, 2021. Since the case was not ready for disposition until after the expiration of the deadline, we find good cause for issuing our decision after the 150-day deadline. See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 39    On appeal, Father argues the trial court's determinations that he was unfit and that the termination of his parental rights was in the best interests of the children were against the manifest weight of the evidence. Father also argues that the court's denial of his motion to continue the best-interest hearing in his absence was an abuse of discretion and violated his right to due process. Father also maintains that the trial court's September 30, 2020, docket entry as to the court's best interest finding did not satisfy the writing requirement of section 2-27 of the Act (705 ILCS 405/2-27 (West 2018)).

¶ 40    Section 2-29 of the Act sets forth a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). First, the State must prove by clear and convincing evidence that the parent is an unfit person as defined by the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent to be unfit, the court must then determine whether the State has proven, by a preponderance of the evidence, that it is in the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re D.T.*, 212 Ill. 2d 347, 367 (2004).

16

During the second stage of the proceedings, the focus of the court's scrutiny shifts from the rights of the parents to the best interest of the child. *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008).

¶ 41 The trial court's decision to terminate parental rights involves factual findings and credibility assessments which, on review, are accorded great deference. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). On appeal, the trial court's findings of parental unfitness and that termination of parental rights was in the child's best interest will not be disturbed unless they are contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998, 1001 (2004).

¶ 42                          Determination of Unfitness

¶ 43 Here, the trial court found that the State had proven one ground of unfitness against Father, that Father failed to make reasonable progress toward the return of the minors in any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2018). The State alleged two nine-month time periods in the petitions, between March 8, 2018, and December 8, 2018, or between March 10, 2019, and December 10, 2019.

¶ 44 "Reasonable progress" is an objective standard, and is based upon the amount of progress, as measured from the conditions existing at the time of removal. *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. Reasonable progress requires a measurable or demonstrable movement toward the goal of reunification. *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. A parent has made "reasonable progress" when the trial court can conclude that it will be able to return the child to parental custody in the near future. *In re Jacorey*,

17

2012 IL App (1st) 113427, ¶ 21. If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill his obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2018).

¶ 45    In this case, the condition that was the original basis for the removal of the minors from the home was that they were in an environment that was injurious to their welfare due to Mother's substance abuse which affected her ability to provide the children with adequate care. The record indicates the children first came into DCFS care in 2016 and were returned home in July 2017. DCFS became involved with the family again in November 2017, after Mother was arrested for possession of methamphetamine. The children remained in the home for approximately two months while DCFS conducted home visits and offered both parents services, including substance abuse services. Father rejected these services as unwanted and unnecessary. On January 10, 2018, Father skipped a court-ordered drug test and then provided a negative but dilute sample a week later. On January 31, 2018, Mother and Father both tested positive for controlled substances, and the children were taken into care. Father's first service plan was created in January 2018 and was revisited three times over the course of the proceeding with the goals remaining unchanged. Father's service plans always included the following tasks: (1) complete a substance abuse assessment and any recommended treatment, (2) complete a mental health assessment and any recommended treatment, (3) attend parenting classes, and (4) cooperate with DCFS.

¶ 46    The evidence in the record demonstrates that Father failed to successfully complete the goals in his service plan. Although Father testified that he completed multiple mental

18

health assessments and that no treatment was ever recommended, Father failed to provide any evidence supporting his alleged compliance. With regard to those services Father did complete, the evidence was that his participation in the recommended service did not result in a change of condition. For example, Father completed a parenting class while incarcerated but, when required to put his parenting skills to work, Father repeatedly exhibited inappropriate behaviors during visits with the minors by talking negatively about the foster parents, the caseworker, and Mother, and by making promises on which he could not deliver. Father's conduct greatly upset the minors, and he was cautioned that the visits would cease if he persisted in this conduct. Father responded by denying any wrongdoing and by calling his children liars. Father, nevertheless, persisted in this conduct, which ultimately resulted in his visits being terminated.

¶ 47 Father also completed a substance abuse program while in DOC and completed a substance abuse assessment following his release from prison which concluded that Father did not require substance abuse treatment. The evidence is clear, however, that Father procured this favorable evaluation by providing the evaluator with false information about his substance use. Furthermore, it was clear that Father continued to struggle with substance abuse, as he had a positive drug test in September 2019 and missed four scheduled tests between September 25, 2019, and November 20, 2019. Father was also arrested and charged with possession of methamphetamine in November 2019.

¶ 48 At the time of the fitness hearing, it had been two years since the minors had been adjudicated neglected. Despite this passage of time, Father had failed to make any measurable movement toward reunification with his children. Based upon the evidence

presented, the trial court's finding that Father was unfit for failing to make reasonable progress toward the return of the minors was not against the manifest weight of the evidence.

¶ 49                    Best-Interest Hearing and Determination

¶ 50    Father raises three issues with regard to the best-interest hearing and the trial court's finding that termination of Father's parental rights was in the children's best interests. First, Father argues that the trial court's denial of his motion to continue the best-interest hearing constituted an abuse of discretion and violated his right to due process. Father also contends that the trial court failed to enter a written order setting forth the court's factual findings supporting its determination in violation of section 2-27(1) of the Act. Finally, Father argues that the trial court's finding that termination of his parental rights was in the minors' best interest was against the manifest weight of the evidence.

¶ 51                        Denial of the Motion to Continue

¶ 52    Father argues the trial court abused its discretion and denied him his constitutional right to due process by denying his counsel's motion to continue the best-interest hearing and by holding the hearing in Father's absence. Father contends the court's denial of his motion prevented him from presenting evidence at the best-interest hearing and deprived him of "his day in court."

¶ 53    A parent has a fundamental liberty interest, protected by the due process clause of the fourteenth amendment, in maintaining a parental relationship with his or her child. *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999). To protect this interest, parents are entitled to certain due process safeguards in actions to terminate their parental rights. *In re D.R.*, 307 Ill. App.

20

3d at 482. These safeguards include the right to be present, to be heard, to present evidence material to the proceedings, and to cross-examine witnesses. *In re D.R.*, 307 Ill. App. 3d at 482; 705 ILCS 405/1-5 (1) (West 2018).

¶ 54 Due process also requires adequate notice to a parent in a juvenile proceeding. *In re C.L.T.*, 302 Ill. App. 3d 770, 778 (1999). Although a parent has the right to be present at a hearing to terminate parental rights, his presence is not mandatory, and the trial court is not obligated to wait until he chooses to appear. *In re C.L.T.*, 302 Ill. App. 3d at 778. The respondent does not have an absolute right to a continuance in a proceeding under the Act. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31. Furthermore, the trial court does not deprive the respondent his right to due process by conducting a termination hearing in his absence. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 34. Whether to grant or deny a motion to continue in a proceeding under the Act is a matter within the trial court's discretion. *In re C.L.T.*, 302 Ill. App. 3d at 778. We will not overturn the trial court's decision absent manifest abuse or palpable injustice. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31.

¶ 55 Contrary to Father's assertions on appeal, the trial court's denial of his motion to continue did not deprive Father of his right to appear at the hearing or to present evidence. Simply stated, Father had the opportunity to appear at the best-interest hearing, he just did not avail himself of the opportunity. Furthermore, Father's counsel was present at the hearing, cross-examined the witnesses, and made arguments on Father's behalf.

¶ 56 Father was present at the fitness hearing on March 11, 2020, and was aware that the best-interest hearing would be held at some point in the near future. Notice of the first setting was mailed to Father, and Father's counsel was aware that the hearing had been

21

continued twice. Even though Father was not sent notice from the court of the final hearing date, Father's counsel advised the court that she had sent Father notice of the hearing via electronic mail. A party has a duty to follow the progress of his case and to learn from his attorney the date of the next hearing. *In re C.L.T.*, 302 Ill. App. 3d at 778. Father has presented no explanation for his absence, and it is reasonable to conclude that Father either failed to reasonably maintain contact with his attorney or to follow the progress of his case, or that he deliberately failed to appear at the hearing. We also note that Father's assertion on appeal that he was "involved at every other hearing" is not accurate. Father attended many of the hearings in the case, frequently as a result of the State issuing a writ for his attendance because Father was incarcerated for a substantial portion of the proceedings. Father, however, did not attend every hearing, including the first hearing following his release from prison. Based on the foregoing, the trial court did not abuse its discretion or violate Father's right to due process by denying his counsel's motion to continue the best-interest hearing.

¶ 57                    Written Order of Termination of Rights

¶ 58    In his brief, Father has asserted that an issue on appeal is whether a trial court may "make an oral finding and docket entry at a best-interest hearing terminating the rights of [Father] without entering a written order with a basis for the termination." Father's only argument on this issue is that section 2-27(1) of the Act requires that the court put the factual basis supporting the determination of parental fitness in writing, and that "there is no written order for parental termination" for Father in this case.

22

¶ 59 Section 2-27(1) of the Act allows the court to order certain placements or to appoint a legal custodian or guardian for a minor that has been made a ward of the court. 705 ILCS 405/2-27(1) (West 2018). The provision, however, instructs that this may be done:

> "[i]f the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian[.]" 705 ILCS 405/2-27(1) (West 2018).

¶ 60 Here, the trial court made oral findings at the hearing and entered consistent findings in a docket entry the same day. The September 30, 2020, docket entry states the court found that it was in the best interest of the minors that Father's parental rights be terminated. The docket entry states this determination was based on the fact that the minors were well cared for in their foster home, and the foster parents loved the children as their own and wanted to adopt them. The court also found that the minors did not currently have contact with Father, and that they did not wish to have contact with Father in the future. While it is preferable for the court to enter its finding in a written order, the docket entry setting forth the court's determination and the factual basis for that determination is sufficient to satisfy the writing requirement of section 2-27(1). See *In re R.M.S.*, 187 Ill. App. 3d 41, 43 (1989) (respondent parent can appeal from the order terminating her parental rights as entered in the record sheet).

23

¶ 61                    Best Interest Determination

¶ 62    Once a parent has been found to be unfit, the parental rights yield to the child's best interest. *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002). Again, this court will not reverse the trial court's determination as to the child's best interest unless it is contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d at 1001.

¶ 63    The record clearly reveals Father's lack of progress to complete the objectives of his service plan. While the finding of adjudication was based on the Mother's substance abuse, the record is clear that Father also had untreated substance abuse issues. Instead of availing himself of the services that could help treat his condition and reunite him with his children, Father rejected those services as unnecessary. While Father maintained contact with his children while he was incarcerated and exercised his visitation with the children after his release, he was not always consistent. Father missed several visits before having his visits temporarily terminated due to his inappropriate conduct. Father did not seek to have his visits reinstated. By contrast, the foster parents were meeting the children's needs, and had been doing so for the last two years. The children were happy in their foster home and bonded to their foster parents. The children had been integrated into their foster family, and the foster parents wished to adopt the children if both parents' parental rights were terminated. Based on the circumstances presented, the trial court's determination that termination of Father's parental rights was in the best interest of the children was not contrary to the manifest weight of the evidence.

¶ 64                                    CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court of Marion

County.


¶ 66    Affirmed.