2022 IL App (2d) 220235-U
Nos. 2-22-0235, 2-22-0236, 2-22-0237 cons.
Order filed November 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* C.F., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No.  20-JA-40 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Kathryn D. Karayannis, |
| Appellee, v. Kelly S., Respondent-Appellant). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* E.B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No.  20-JA-34 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Kathryn D. Karayannis, |
| Appellee, v. Kelly S., Respondent-Appellant). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* E.B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No.  20-JA-34 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Kathryn D. Karayannis, |
| Appellee, v. Terry B., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Brennan and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In these consolidated appeals, appellate counsels' motions for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re Alexa J.*, 345 Ill. App. 3d 985 (2003), were granted, and the circuit court's orders terminating respondents' parental rights were affirmed, where there are no issues of arguable merit to challenge the judgments.

¶ 2    On June 6, 2022, the circuit court of Kane County entered orders terminating the parental rights of respondents, Kelly S. and Terry B., in their biological child, E.B., as well as the parental rights of Kelly S. in her biological child, C.F.[1]  Respondents filed separate appeals challenging the court's determination that they were unfit, and that termination of their parental rights was in the best interests of E.B. and C.F.  Respondents were provided with appointed counsel for the appeal, but counsel for both respondents have filed motions to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1968), and *In re Alexa J.*, 345 Ill. App. 3d 985 (2003).  On our own motion, we consolidated the appeals for decision.  Each counsel states in his or her respective motion that they thoroughly reviewed the entire record on appeal, researched the applicable statutes and case law, and concluded that there are no arguably meritorious issues on appeal that could be raised on their client's behalf.  Each counsel mailed a copy of their respective motions to their client's last known address and emailed it to their last known and used email address.  We advised respondents that they had 30 days in which to file a response as to why their counsel's motion should be denied and why this court should not, after a proper review of the record, affirm the judgment.  More than 30

_____

[1] C.F.'s putative father, Kirkland F., did not appear at any trial court proceedings.  After his parental rights were terminated, he did not file a notice of appeal, and, thus, he is not a party in the instant proceedings.

days have passed, and neither respondent has filed a response. For the reasons that follow, we grant counsels' motions to withdraw and affirm the judgments.

¶ 3                                    I. BACKGROUND

¶ 4     On January 15, 2019, the State filed a petition for adjudication of wardship in McHenry County regarding C.F., then aged 19 months, alleging that he was a neglected minor in that his environment was injurious to his welfare, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2018)). The petition alleged the following. On January 14, 2019, Kelly and C.F. were staying at a homeless shelter. Staff reported that Kelly presented with mental health needs and was volatile while caring for C.F. The minor screamed throughout the night, and staff had to "stay on top of [Kelly] to watch [C.F.]" Kelly was "kicked out of the PADS Shelter" and stated that she would "go live in the woods" with C.F. The police were called, and Kelly was arrested after she kicked one of the officers.

¶ 5     After a shelter care hearing, the Illinois Department of Children and Family Services (DCFS) was granted temporary custody of C.F. On May 30, 2019, C.F. was adjudicated neglected due to an environment injurious to his welfare. 705 ILCS 405/2-3(1)(b) (West 2020). The trial court named a Court Appointed Special Advocate (CASA) to serve as guardian *ad litem* (GAL).

¶ 6     At a dispositional hearing on July 11, 2019, Kelly was found unable and unwilling to care for C.F., but the court reserved the issue of her unfitness. The goal of return home within 12 months was selected. At a September 12, 2019, status hearing, the court found that Kelly was unfit to care for C.F., and it admonished her to cooperate with DCFS and its agency, Youth Service Bureau (the Agency), comply with the terms of the service plan, and correct the conditions that brought C.F. into care or risk termination of her parental rights.

¶ 7     On December 23, 2019, Kelly gave birth to E.B. On March 8, 2020, a hotline call was

placed from a homeless shelter in Kane County, where Kelly was living, to report that she was intoxicated while caring for E.B., then aged 2 ½ months. Kelly was "slurring words and stumbling into walls" while holding E.B. The police were called, and reports of the incident indicate that Kelly was belligerent and combative. E.B. was taken into protective custody, and Kelly was arrested and charged with child endangerment. At that time, Terry, E.B.'s biological father, was in the Kane County jail in connection with two felony counts of aggravated battery and two counts of misdemeanor battery involving a third party.

¶ 8 On March 9, 2020, the State filed a petition for adjudication of wardship in Kane County regarding E.B. It alleged that E.B. was neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)), in that his environment was injurious to his welfare, due to Kelly's substance abuse issues and Terry's failure to protect. It also alleged that E.B. was a dependent minor pursuant to section 2-4(1)(a) of the Act (705 ILCS 405/2-4(1)(a) (West 2018)) because both parents were incarcerated in the Kane County jail. The next day, respondents appeared in Kane County on E.B.'s case and stipulated to probable cause and that there was an immediate and urgent necessity to remove E.B. from the home. The court granted temporary custody of E.B. to DCFS.

¶ 9 On March 12, 2020, the circuit court in McHenry County transferred C.F.'s case to Kane County, and the Kane County circuit court entered an off-call order continuing the matter to June 18, 2020, to be considered in tandem with *In re Interest of E.B.*, case No. 20-JA-34.

¶ 10 On June 18, 2020, respondents stipulated that E.B. was a neglected minor, in that his environment was injurious to his welfare. The court admonished them to cooperate with DCFS and correct the conditions that brought E.B. into care or risk termination of their parental rights. It set a date for a dispositional hearing in E.B.'s case for July 14, 2020. The court then conducted

a permanency review with respect to C.F., and it set the goal at return home within 12 months. The court found that neither the prior goal of return home within five months, nor the new goal of return home within 12 months, had been achieved. It explained that, although Kelly was making efforts, she had not made reasonable progress, and it emphasized that E.B. had recently come into care due to Kelly's substance abuse problems.

¶ 11    On July 14, 2020, the court held a dispositional hearing in E.B.'s case. Kelly stipulated that she was unfit and required services prior to having E.B. returned to her care. An integrated assessment recommended that Kelly participate in individual counseling services, substance abuse services, random drug screens, a parenting capacity assessment (PCA), and maintain stable housing. Terry's counsel reported that he would also stipulate to being unfit but, when questioned by the court, Terry refused to answer whether he wished to so stipulate. The matter proceeded to a hearing, where the State emphasized that Terry completed an integrated assessment, which recommended several services, namely: individual counseling, parent education and coaching, relationship building activities, random drug screens, as well as recommended stable housing and financial stability. The State also asserted that, "based on the known circumstances," he should also participate in anger management counseling and domestic violence counseling. The court found Terry was an unfit parent, citing the integrated assessment and the factual basis upon which E.B. came into care. E.B. was adjudicated neglected, made a ward of the court, and placed into the custody and guardianship of DCFS. The court set the goal at return home within 12 months.

¶ 12    At a status hearing on October 20, 2020, the caseworker reported that Kelly was "engaging well" in weekly individual counseling at Braden Counseling Center, and that she had undergone two drug screenings that were clean. The State requested, and the court ordered, that Kelly submit to a drug screen *instanter*. The GAL reported that Kelly failed to appear for several visits with the

minors and, when she did appear, her supervision of C.F. was inadequate. Terry's counsel reported that Terry was attending visits with E.B, but he had not yet engaged in services because the referrals had not been approved. It was anticipated that DCFS would have contracts finalized with the providers later that week.

¶ 13    On December 14, 2020, the circuit court held a permanency review hearing regarding C.F. and a status hearing regarding E.B. Concerning C.F., the State and the GAL requested that the goal be changed to substitute care pending termination of Kelly's parental rights due to her lack of progress and engagement in services. The GAL reported that Kelly had not found appropriate housing and was residing in a car with Terry. The GAL also noted that she had failed to appear for multiple drug screenings, which were considered positive drops. The GAL further noted that the integrated assessment and service plan recommended that she participate in individual psychotherapy to treat her delusional disorder, which was diagnosed during a January 2020 psychological evaluation, and that her risk factors outweighed the protective factors, just as in her March 2019 integrated assessment. In the GAL's view, Kelly showed "little progress throughout the life of the case." A report from the caseworker noted that Kelly had been engaging in individual therapy and had undergone a drug and alcohol evaluation October 2020, which recommended that she complete at least 20 hours of outpatient substance abuse treatment. The caseworker's report also noted that the Kelly tested positive for cocaine following the drug screen ordered by the court on October 20, 2020. Kelly's counsel objected to the recommended goal change and called her to testify regarding her progress in correcting the conditions that led to C.F.'s placement outside the home. Following additional testimony from the caseworker and argument from the State, the GAL, and Kelly's counsel, the court reserved a ruling on any goal change. The court warned Kelly that it was "on the verge of changing the goal" to substitute care pending a determination on

termination of parental rights, but it explained that it wished to see an updated PCA and a report from her therapist. It stated that those reports would have to be "glowing" because C.F. had been in care "for just far too long," and Kelly continued to lack housing stability. The court found that, although Kelly had made some efforts, she had not made progress toward returning C.F. home. Regarding E.B.'s case, the court stated that "the same thing applies" and that "we are kind of stagnant here" because Kelly was "not accomplishing what needs to be accomplished." Terry did not appear for the proceedings.

¶ 14     On March 9, 2021, the circuit court entered a permanency order in both cases. It found that Kelly had made some progress, in that she had found a job and had completed ten sessions of individual counselling and the recommended substance abuse treatment. However, she had failed to appear for two PCA's and had two recent positive drug screens—one for cocaine, and one for amphetamines for which she did not produce a prescription. The court found that Kelly had made neither reasonable efforts nor reasonable progress toward returning the minors home. Regarding Terry, the court noted that he had not been involved in services since the last reporting period, and it found that he had made neither reasonable efforts nor reasonable progress toward returning E.B. home. Despite the State's request to set the goal to substitute care, the court maintained the goal at return home within 12 months. The court again warned Kelly that "the rope [was] short" and reminded her to participate in the required services or risk termination of her parental rights. It also rebuffed Terry's suggestion that he should not be required to complete any services, and it advised him to comply with his service plan.

¶ 15     At a status date on May 18, 2021, the court noted that Kelly had recently completed a PCA and that she had reengaged in individual therapy. The caseworker filed a report that included a report from Dr. Gamze regarding prescribed amphetamines for Kelly, and the caseworker was

ordered to follow up to confirm the dosage. The court also requested written reports from her counselor as to her progress in therapy. Terry asserted that he completed his individual therapy and that he was registered for domestic violence services, although he had filed an administrative appeal to challenge the recommendation for domestic violence services. The caseworker informed the court that Terry had not complied with any of the required drug screenings, and that he would not be referred for parenting education classes until there was progress in the required domestic violence services, for which a referral was made.

¶ 16    A permanency review hearing was held on August 24, 2021. Based on recommendations by the State, GAL, and the Agency, the circuit court changed the goal to substitute care pending determination of termination of parental rights. In changing the goal, the court acknowledged that Kelly was engaging in services, but it found that she was making no progress in them. It stated that, although she had finally participated in a PCA, "the evaluator expressed concerns that [she] has a lack of understanding of her own mental health," including her diagnosis of delusional disorder. It also found that she lacked empathy for C.F. and was not bonding well with him during visitation, and that she was still failing to appear for various drug screenings—the most recent of which was just a few weeks prior. Regarding Terry, the court found that he had made efforts, but he had not made progress toward returning E.B. home. It noted that he continued to refuse all drug screenings and had failed to complete domestic violence services. It also cited Terry's argument that he should not be subject to any services and that E.B. being in care was not his fault.

¶ 17    On September 22, 2021, the State filed petitions to terminate Kelly and Terry's parental rights. It alleged that Kelly was unfit based on her failure to: (1) make reasonable efforts to correct the conditions which were the basis for removal during certain nine-month periods (750 ILCS 50/1(m)(i) (West 2020)); (2) make reasonable progress toward the return of the minors during

certain nine-month periods (*id*. § 1(m)(ii); (3) protect the minors from conditions injurious to their welfare (*id*. § 1(D)(g)); and (4) maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare (*id*. § 1 (D)(b)). As to ground (m), the failure to make reasonable efforts or progress to return C.F. home, the State cited the following nine-month periods: June 1, 2019, through March 1, 2020; March 2, 2020, through December 2, 2020; and December 3, 2020, through September 3, 2021. Concerning E.B., the State relied on the nine-month period from July 15, 2020, through April 15, 2021. Regarding Terry, the State alleged he failed to (1) make reasonable efforts to correct the conditions that were the basis for E.B.'s removal, or reasonable progress toward his return, during the nine-month period from July 15, 2020, through April 15, 2021 (*id*. §§ 1(D)(m)(i), (ii)); and (2) maintain a reasonable degree of interest, concern or responsibility as to E.B.'s welfare (*id*. § 1(D)(b)).

¶ 18                                  A.  Unfitness Hearing

¶ 19    The circuit court combined a final permanency review hearing with the termination hearing, which was held on May 24 and May 26, 2022. Rebecca Kupsik, a caseworker with the Agency, testified as follows. DCFS became involved after Kelly was arrested following erratic behavior and kicking a police officer. She was the caseworker from October 2019 until January 2021, and, during that time, Kelly was unable to maintain housing stability. Kupsik assisted her in obtaining a housing voucher, but Kelly was unable to utilize it due to incomplete paperwork. Although Kelly had completed individual counseling services, she was referred for additional counseling services after E.B. was taken into care. Kelly went "back to square one," and the Agency was concerned that the prior services she received did not successfully address her needs.

¶ 20    Kupsik referred Kelly for random drug testing, citing transportation issues, she frequently did not attend them. Kupsik arranged transportation, Kelly still missed numerous drug testing

appointments. After a court-ordered drug screen in October 2020, Kelly tested positive for cocaine. Following the positive drug test and missed drug screens, she was referred for another substance abuse evaluation. Kelly was referred for mental health services and was evaluated by Dr. Mather in February 2019. She also completed a psychological evaluation in January 2020 with Dr. Gardner and was referred for a PCA. The Agency incorporated the doctors' recommendations into the service plan, although many of the recommendations were already included in it, such as individual counseling and a PCA. Kelly eventually completed a PCA, which raised concerns regarding her mental health and ability to parent. She commenced individual counseling at Braden, and her counselor informed Kupsik that she was making progress. Kelly was also referred for anger management services in July 2020, but she did not follow-up on that service.

¶ 21    Concerning Terry, Kupsik testified that he participated in two integrated assessments. The first one recommended that he participate in random drug screenings to assure his sobriety, but he did not participate in any. He told Kupsik that he would not attend any drug screenings unless the foster parents for E.B. were also tested. Because of the missed drug screenings and his prior convictions related to the manufacture and delivery of controlled substances, Terry was referred for a substance abuse evaluation, which he likewise refused to attend. A second integrated assessment was prepared after E.B. was born. It recommended that Terry participate in individual counseling, anger management, parenting, and substance abuse services. Kupsik testified that anger management services were appropriate because, at the time E.B. came into care, Terry was in jail on two counts of felony aggravated battery and two counts of misdemeanor battery involving a third party. Referrals for these services were made in July 2020, but Terry did not follow up on them. Kupsik further testified that Terry was recommended for individual counseling because he refused to acknowledge that he had a case with DCFS. Kupsik testified that Terry was "very

interested" in E.B. during his visits with him. She initially had "concerns on Terry's ability to know how to change his diaper *** and feed him," but he improved in those areas over time. However, he denied any responsibility for the circumstances in which E.B. came into care.

¶ 22     Dr. Mary Gardner, a licensed clinical psychologist, testified as follows. She performed a psychological evaluation of Kelly in January 2020. During the evaluation, Kelly was initially friendly but, as Gardner probed her thought processes, she made inconsistent and illogical statements, particularly when discussing what brought her children into care. Kelly also had a "marked tendency to avoid disclosure," and she denied things that most people would admit to. Based on the totality of the clinical interview test data and record review, Dr. Garner diagnosed Kelly with delusional disorder, whose "hallmark is an irrational thought process." She explained that individuals with delusional disorder often appear normal until their delusions are challenged. The disorder "falls under the category of psychotic functioning," and individuals with that disorder "generally *** have a fixed and rigid belief about something that cannot be changed even with treatment and therapy." Dr. Gardner testified that Kelly provided information that was inconsistent with documented facts, such as when she denied having a physical altercation with a police officer prior to her arrest. She also made statements that broke from reality, such as when she reported observing a child's hair change color after the child took a vitamin. Dr. Gardner recommended that Kelly: (1) participate in weekly psychotherapy with a counselor who specializes in individuals who have a significant mental health history; (2) complete a PCA; (3) complete a substance abuse assessment; and (4) be referred for anger management services.

¶ 23     Dr. Gardner also testified as to a March 2021 PCA. Kelly rated poorly in the areas of insight and judgment and was rated "high risk" in the area of expectations for children. Dr. Gardner recommended additional parenting coaching and continued therapy. She completed a

second PCA in April 2022. Kelly's results were "fairly similar" to the first assessment. Again, Kelly was amiable and forthcoming at first, but when she was confronted about the topic of why the minors came into care, she exhibited increased anxiety and irritability, and she made statements that were inconsistent with her records. Although Kelly made modest improvements in some areas, Dr. Gardner still had concern regarding her interactions with her children, and she showed no growth in that area. In Dr. Gardner's view, Kelly's individual therapy did not benefit the areas of concern that were reflected in the prior PCA.

¶ 24    Hannah Wykoski testified that she was the current caseworker assigned to the minors, having been assigned to their cases in July 2021. Although it was reported that Kelly was progressing in therapy, Wykoski had concerns regarding Kelly's mental health because she continually denied having mental health concerns and would not admit fault for assaulting the police officer during the incident that led to C.F. coming into care. Regarding housing, Wykoski testified that Kelly obtained housing in August 2021, but the program she obtained it through provided benefits for only one year. Wykoski testified that Kelly provided no documentation to support her assertion that she had a job. Kelly completed substance abuse treatment in February 2021, but she thereafter tested positive for cocaine a second time, in January 2022. Kelly was sent for another substance abuse evaluation in March 2022 but, when she appeared for the assessment, she was under the influence of alcohol. She was recommended for further substance abuse treatment. Kelly's demeanor, in her interactions with Wykoski, was "quite hostile," and she never demonstrated an understanding of why her children were in care.

¶ 25    Wykoski also testified as to Terry's progress in his services. Terry was "generally defiant" and "quite aggressive regarding services or visitation." As the caseworker responsible for implementing the service plan, Wykoski was tasked with assessing whether the participated-in

services corrected the issue that the individual was referred for. Notwithstanding Terry's completion of an anger management program and individual counseling, in her opinion, neither service remedied the areas that Terry was referred for, and he did not demonstrate any coping skills that were covered in either program. He also did not have an understanding as to why E.B. came into care, as he insisted that the "case was not against him" because it only involved Kelly, and he steadfastly denied that he had an open case with DCFS. Wykoski also testified that Terry was referred for a parenting skills program, but he did not complete it and, as a result, he was unable to begin the parent coaching portion of that service. Like the prior caseworker, Wykoski requested that Terry participate in random drug screenings, but he refused. Terry also accused her of being racist after she declined to allow him and Kelly to have simultaneous visitation with E.B.

¶ 26    Kelly testified as follows. With the help of a subsidy that covered half of her monthly rent, she had been living in a two-bedroom apartment since June 2021. She was looking for an apartment that would accept her "Section 8 voucher" but, if she was unable to find housing that would accept that voucher, she planned to stay in her current apartment and pay the entire rent with her earnings when her subsidy expired. Kelly reported that she was working for a temporary employment agency, but she provided no documentation to substantiate the claim. She also denied being in a romantic relationship with Terry.

¶ 27    Kelly admitted that she had consumed "a couple beverages" when E.B. came into care, but she denied being intoxicated. She testified that, until that point, she had abstained from alcohol while the cases were ongoing, and she was attending weekly Alcoholics Anonymous meetings. She acknowledged testing positive for alcohol when she appeared for a second substance abuse evaluation in January 2022, but she asserted that it was because she consumed two mixed drinks the prior night. She "very rarely" drank alcohol. She acknowledged that she previously

participated in substance abuse treatment programs following DUI convictions in 2009 and 2011. Regarding illegal drug use, Kelly testified that she did not know why she tested positive for cocaine in October 2020 and January 2022. She denied ever using illicit substances. She acknowledged that she tested positive for amphetamines in February 2021 but asserted that it was prescribed by her psychiatrist. She ceased taking that medication after she experienced a negative reaction. She acknowledged that her integrated assessment with Dr. Mather, as well as her integrated assessment in March 2019, recommended that she maintain sobriety.

¶ 28 Kelly also testified regarding her January 2020 psychological evaluation with Dr. Gardner. She did not believe that her diagnosis of delusional disorder was accurate, and she denied that "this disorder actually existed." She asserted that Dr. Garner relied only on documents drafted by the caseworker and responding police officers—documents which she characterized as "inaccurate." She felt that it was "unfair [of Dr. Gardner] to disregard any statements that [she] made" in favor of documents that did "not match the facts of the matter."

¶ 29 Regarding her individual counseling, Kelly testified that she gained an understanding of her mental health needs, and that she had "kind of stabilized" because she learned how to "just remain stable and calm and *** deal with anxiety." She did not discuss her diagnosis of delusional disorder with her counselor, and she "ignored all that because it's not accurate." She denied a belief that the professionals in this case were telling lies about her, but she did not think that they had "perform[ed] their duties in a fair manner."

¶ 30 Terry testified that he lived in a one-bedroom apartment in Elgin that was large enough to accommodate two individuals. He was working full-time in a warehouse and, if E.B. was returned to his care, he would rely on family to care for him while he is at work. He lacked furniture for E.B.'s use, such as a crib, but he could rapidly acquire suitable furniture. Terry acknowledged that

he refused to submit to any of the required drug screenings, but he attributed that failure to his frustration with the court and the Agency, because he felt that he was not being treated fairly. He did not appear for any drug screenings because he did not "feel like [he] should necessarily have to belittle [himself] nor disrespect [himself] just to prove a point to somebody when they made a mistake to begin with." He testified that he previously submitted to drug screenings for his employer, and he had never tested positive for drugs. He stated he "probably *** wouldn't feel comfortable" allowing his employer to share that information with DCFS, but he later stated during his testimony that he "probably wouldn't have a problem with doing it."

¶ 31 Terry testified that he was previously incarcerated for the manufacture, sale, and distribution of controlled substances, but he refused the Agency's recommendation that he participate in a substance abuse assessment because he had never used illegal drugs and "shouldn't have to prove that to anyone." He also acknowledged that, in 2015, he pleaded guilty to unlawful possession of a controlled substance. At the time E.B. came into care, he was in jail on charges of aggravated battery in connection to punching a man in the face, who required a days-long hospital stay. He ultimately pled guilty to a reduced charge of misdemeanor battery.

¶ 32 Terry testified that he disagreed with the Agency's recommendation that he participate in domestic violence counseling because he had no domestic violence incidents involving Kelly, and he believed that a parent should only be required to participate in a particular service if they have a criminal case connected to it. He acknowledged that the Agency ultimately withdrew the recommendation for domestic violence counseling and replaced it with a recommendation for anger management classes. He completed individual therapy and anger management classes and "received some benefit" from them, but he "felt like [he] was there for something that [he] didn't have anything to do with." He agreed that he did not complete the required parenting skills classes

and he had not yet started parenting coaching classes. He was willing to complete that class, even though parent coaching "is for big kids." He denied being in a romantic relationship with Kelly, stating that their romantic relationship ended a few months prior.

¶ 33    On June 6, 2022, the court found that the State had proven by clear and convincing evidence that both parents were unfit on each of the grounds alleged in the State's petitions. Regarding Terry, the court emphasized that he did not maintain a reasonable degree of interest or responsibility for E.B. because, although he clearly loved his son, he did not complete the tasks prescribed in the service plan necessary for him to become a fit parent. It reasoned that Terry did not begin either the parenting education services or anger management services until after the nine-month period alleged by the State had concluded, he did not participate in a substance abuse evaluation, he refused to attend any of the required drug screenings, and he was in an on-and-off relationship with Kelly, who had current substance abuse issues. The court also stressed that Terry continued to deny having a DCFS case, and he never acknowledged why his case was in court and refused to acknowledge that he bore some responsibility for E.B. coming into care.

¶ 34    In explaining its finding of parental unfitness regarding Kelly, the court stated that, although she demonstrated interest and concern for her children, she lacked reasonable progress in the services she engaged in and failed to complete others. It emphasized the results of Dr. Mather's February 2019 psychological evaluation, which stated that "there is more to be known about [Kelly's] history and current circumstances" and opined that unstable interpersonal relationships, an unstable living situation, and poor employment history, suggested substantial and chronic mental health problems. The court looked to the March 2019 integrated assessment, which stated that Kelly has significant difficulty with her mood and behavior regulation, which caused her to be angry, impulsive, and delusional, and that she had poor insight into her mental health

issues and the impact that those issues had on her ability to parent. It also noted Kelly's diagnosis of delusional disorder, paranoid and persecutory type, which is characterized by an irrational thought process. The court stated that her irrational thought process persisted and that she made no improvement in this area, and it reiterated that Kelly denied the diagnosis. The court noted that even after Kelly's second PCA, Dr. Gardner observed that the results were essentially unchanged from the first evaluation, meaning that Kelly had not benefited from her individual therapy.

¶ 35    Regarding substance abuse, the court stated that Kelly was "a repeat relapser," noting that she was intoxicated when E.B. came into care and when she reported for her second substance abuse evaluation. The court also emphasized that Kelly tested positive for cocaine in October 2020 and January 2022, and tested positive for amphetamines in February and March 2021. Thus, the court found that Kelly had "not addressed her substance abuse issues," nor had she completed the required anger management counseling. Regarding housing, the court found that, even though Kelly had a place to live at the time of the hearing, it was unclear whether she could stay there, and she provided no documentation to substantiate her assertion that she was employed. Finally, the court commented that visits with her children were "not great," because Kelly and the children were "not close," and she was unable to address both children's needs at the same time. Moreover, the court stated that Kelly "appears to be in some kind of continued relationship with [Terry], who has also been found unfit as a result of these proceedings."

¶ 36                          B. Best Interests Hearing

¶ 37    The cases proceeded to a best interests hearing. Wykoski testified that C.F., then aged five, was placed with his maternal uncle, with whom he had bonded well. She had observed C.F. and his foster father together, and the residence was "a very loving home." C.F. had friends in the community, and he felt safe and loved in his placement. C.F. referred to his foster father as "dad,"

and they had fun, played games, and learned together. Wykoski testified that all of C.F.'s needs were being met, and his foster father was willing to provide for C.F. permanently and maintain his relationship with his younger brother, E.B. Wykoski further testified that E.B., then 2 ½ years of age, was placed in a traditional foster home, where he had been since the case was opened. Wykoski described it as a "very loving home," and E.B. called his foster parents, "mom" and "dad." Wykoski had no concerns that E.B.'s needs were not being met, and the foster parents were willing to provide for his needs going forward.

¶ 38    After considering all the evidence, the credibility of the witnesses, and the necessary statutory factors, the circuit court found that it was in the best interest of both minors that the parental rights of Kelly and Terry be terminated. It incorporated its findings from the unfitness hearing and stated that Kelly "has had 5 different evaluations showing substantial mental health concerns which remain unaddressed." It also reiterated her ongoing substance abuse, stating that "at best[,] she repeatedly relapses, and at worst[,] she continues to be a substance abuser." She also had not addressed her mental health issues sufficiently to parent either minor. Turning to Terry, the court emphasized his denial of responsibly for E.B. coming into care, and that he had only a one-bedroom apartment and no furniture for E.B. He was also unwilling to complete the required services. Conversely, both minors were in stable, pre-adoptive homes and were very attached to their foster families. It also noted that C.F. had been in care for more than three years, and E.B. had been in care for more than 2 ½ years, which was nearly his entire life.

¶ 39    Respondents timely appealed.

¶ 40                                II. ANALYSIS

¶ 41    On appeal, counsel for both parents seek to withdraw pursuant to *Anders*, 386 U.S. at 738, on the basis that there are no meritorious issues to be raised. *See*, *e.g., In re S.M.*, 314 Ill. App. 3d

682, 685 (2000) (*Anders* applies to cases relating to termination of parental rights). Under the procedure outlined in *Anders*, counsel's motion must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Id*. at 744. This is so because counsel is obligated to advocate on behalf of his or her client. *Alexa J.*, 345 Ill. App. 3d at 987. Counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why he believes the arguments are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Counsel must then conclude that no viable grounds exist for the appeal. Finally, appellate counsel should include the transcripts from the fitness and best-interest hearings. *Alexa J.*, 345 Ill. App. 3d at 989. In doing so, counsel must review both the finding of unfitness and the best interest determination, and the *Anders* brief should indicate as much. *S.M.*, 314 Ill. App. 3d at 686.

¶ 42 Given the foregoing, we agree with counsel that no viable argument exists that the circuit court erred in finding that respondents are unfit and that it is in the best interests of the minors that parental rights be terminated. Proceedings to terminate parental rights are governed primarily by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2020)) (Act) and the Adoption Act (750 ILCS 50/1 *et seq*. (West 2020)). The Act provides a two-step process for involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). Initially, the court holds an "unfitness hearing," during which the State must make a threshold showing that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). If the court finds the parent to be unfit, it proceeds to a "best interest hearing," where it determines whether it is in the best interests of the minor to sever the respondent's parental rights. *Deandre D.*, 405 Ill. App. 3d at 953.

¶ 43 As noted, section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) lists numerous grounds under which a parent may be found unfit. Any one ground, properly proved, is sufficient

to affirm. *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1049 (2003). Because the termination of parental rights severs the parent-child relationship, proof of unfitness must be proved by clear and convincing evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The trial court is generally in the best position to assess the credibility of the witnesses and, as such, we will not reassess credibility on appeal. Accordingly, we will not disturb a trial court's determination regarding parental unfitness unless it is contrary to the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly evident. *In re Joshua S.*, 2012 IL App (2d) 120197, ¶ 44.

¶ 44    Here, the State alleged that Kelly was unfit based on her failure to: (1) make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period (750 ILCS 50/1(m)(i) (West 2020)); (2) make reasonable progress toward the return of the minors during any nine-month period (*id*. § 1(m)(ii); (3) protect the minors from conditions within their environment injurious to their welfare (*id*. § 1(D)(g)); and (4) maintain a reasonable degree of interest, concern, or responsibility as to their welfare (*id*. § 1 (D)(b)). The trial court found that the State proved all four grounds by clear and convincing evidence. However, we need not address each ground, because any one of them, if not contrary to the manifest weight of the evidence, is enough to affirm the trial court's finding. *Gwynne P.*, 215 Ill. 3d at 354.

¶ 45    We agree with Kelly's counsel that there is no meritorious argument to be made that Kelly is a fit parent. We elect to address her failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2020)), because the circuit court appeared to emphasize this ground in its finding. The language of subsection 1(D)(b) of the Act is in the disjunctive, meaning that any of the three elements, either interest *or* concern *or* responsibility, may alone form the basis of an unfitness finding. *In re C.L.T.*, 302 Ill. App. 3d 770,

773 (1999). In evaluating whether a parent has demonstrated a reasonable degree of interest, concern, or responsibility for the minor's welfare, the court must consider the parent's reasonable efforts to maintain contact with the child, and not his or her success, and it must consider any circumstances that hindered the parent's ability to visit, communicate with, or otherwise show interest, concern, or responsibility for the minor. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). The court may also consider the parent's failure to complete the tasks outlined in the service plan. *In re L.M.*, 189 Ill. App. 3d 392, 400 (1989). In evaluating whether the parent has failed to maintain a reasonable degree of interest, concern, or responsibility, the court will consider the parent's conduct during the entire period following adjudication—not just the parent's conduct during the service plan. See *In re Jason U.*, 214 Ill. App. 3d 545, 552 (1991).

¶ 46 Here, the record demonstrates, and the circuit court reasonably determined, that Kelly failed to maintain a reasonable degree of interest, concern, or responsibility as to either of her children as the result of her failure to make reasonable progress in her services and her failure to complete other services. The court determined that, although Kelly made some progress in certain areas, she made little to no progress in the paramount issues of her mental health and substance abuse. We hold, based on our careful review of the record, that the trial court's determination was not against the manifest weight of the evidence. One month after C.F. came into care, in February 2019, Dr. Mather completed a psychological evaluation of Kelly, during which she denied any recent or ongoing psychological symptoms or substance abuse. Dr. Mather's report states that, due to Kelly's brief and evasive answers, he was unable to "clarify [Kelly's] diagnostic picture." He opined that there was "more to be known about [Kelly's] history and current circumstances" and stated that her "living situation, poor employment history, and unstable interpersonal relationships are suggestive of substantial and chronic problems which are more likely than not to

involve some sort of mental health disorder (*i.e.*, mood disorder, substance abuse disorder)."

¶ 47    Less than one year later, in January 2020, Kelly underwent another psychological evaluation, this time with Dr. Gardner.  Following that evaluation, Kelly was diagnosed with delusional disorder, which Dr. Gardner described in her report as "a mental illness in which a client maintains a fixed belief in something, even when there is evidence to the contrary. Regardless of this conflicting evidence, the client is unable to dislodge the belief."  Dr. Gardner's report noted that Kelly may have a "persecutory-type delusion," where the individual believes they are being conspired against, cheated on, maligned, or followed or harassed by someone.  She continued that, "[s]mall slights are amplified in this disorder," and individuals with a persecutory delusion are commonly angry, resentful, and susceptible to resorting to violence toward those they believe are hurting them.  Kelly's risk factors outweighed the protective factors, and Dr. Gardner recommended that Kelly be referred for a PCA, undergo random drug and alcohol drops, take anger management classes, and participate in "weekly psychotherapy with a counselor who is trained in working with individuals who have a significant mental health history."

¶ 48    Upon referral, Kelly completed a PCA in April 2021 with Dr. Gardner.  The report reflected that Dr. Gardner had concern that Kelly often did not take responsibility for her own actions, lacked empathy for her children, and lacked an understanding of her mental health needs.  The assessment identified several potential risks to the minors if they were returned to Kelly's care. For example, it stated that Kelly's "inadequately treated mental health issues," of which she did "not have an accurate understanding," would be a regular source of conflict and would be damaging to the minors.  It stated that Kelly routinely deflected blame onto external sources and deflected from her own actions.  Her struggles with mental health, according to the assessment, also "play[ed] a prominent role" in her "difficulty finding and keeping suitable housing."  The

assessment noted that Kelly had been living in homeless shelters since 2018, and she had been unable to secure adequate housing even after receipt of a housing voucher. She was "unduly mistrustful of others" and frequently made poor decisions. The assessment also noted Kelly's significant substance abuse history, particularly involving alcohol, and noted that her records "document her overuse of alcohol when she was with the children." An updated PCA was prepared in April 2022 and reflected only minimal improvement in her parenting capacity. Notably, it stated that "[i]t appeared that the previous risks and concerns that had been identified still exist," and that much of Kelly's "problematic behavior was primarily related to her mental health issues." Dr. Gardner reported that, during observations between Kelly and the minors, Kelly's "attunement was off," and she had "difficulty really engaging with the boys" and "showed a marked preference for [E.B.]" Dr. Gardner testified consistently with her report at the fitness hearing, and she emphasized that she still had concerns regarding Kelly's interactions with the minors because she showed no growth in that area. Dr. Gardner also opined that Kelly made no improvement in the areas that were identified pertaining to the risks that would arise if the minors were returned to Kelly's care. Throughout the proceedings, Kelly made scant progress in the areas of her mental health, denied the accuracy of her diagnosis, and, during her testimony at the fitness hearing, denied that the disorder even existed. Because of her disbelief of her mental health challenges, she did not discuss her diagnosis with her therapist and "ignored all that because it's not accurate."

¶ 49    The evidence also demonstrated that Kelly repeatedly abused drugs and alcohol while her cases were ongoing. When C.F. was already in care, Kelly became intoxicated while caring for E.B., then aged 2½ months, at the homeless shelter where she was living. According to the reports, Kelly was holding E.B. and was "slurring words and stumbling into walls." E.B. was taken into

protective custody, and Kelly was belligerent and combative with the police. In addition, Kelly missed numerous required drug screens and tested positive for cocaine in October 2020 and January 2022. She was referred for a second substance abuse evaluation as a result of cocaine being detected in her drug screen in January 2022, but, when she appeared for the evaluation, she tested positive for alcohol. The court stated that it found Kelly's explanation that she had consumed two mixed drinks the night before not credible, and it found that she is "a repeat relapser." Based on the foregoing, the evidence as to the State's petition to terminate Kelly's parental rights stemming from her failure to maintain a reasonable degree of responsibility as to the minors' welfare was sufficient to find her to be an "unfit person" under section 1(D) of the Adoption Act, and we agree with her appellate counsel that no meritorious argument could be made that the court's unfitness finding was against the manifest weight of the evidence.

¶ 50    Regarding Terry's unfitness, we likewise agree with his counsel that the record presents no issue of arguable merit to challenge to the circuit court's finding that he is an unfit parent, because there is ample evidence that Terry failed to make reasonable efforts or reasonable progress to correct the conditions that brought the case into care within the nine-month period between July 15, 2020, and April 15, 2021. The evidence demonstrates that, by the time of the first permanency review hearing in E.B.'s case on March 9, 2021, Terry had not begun services in any significant way. Among other services, Terry was required to submit to random drug testing, remain appropriate and consistent during visitation, obtain appropriate and safe housing, complete parenting coaching, demonstrate skills learned in parenting coaching during visitation, attend counseling services, and participate in domestic violence services. At the hearing, the caseworker testified that Terry reported starting parenting education classes, but the Agency was unable to verify that information. Terry also failed to appear for any of the required random drug screenings,

specifically on September 25, 2020, October 21, 2020, January 4, 2021, and February 26, 2021. He reportedly refused to complete the October 2020 drug screen because he felt that he "was only being dropped because he is African American." He did not acknowledge the other noted drug screenings. The court admonished Terry to comply with the service plan, notwithstanding his assertions that he should not be required to complete any services, and it stated that it would give him "a final time to show us what he is doing."

¶ 51    At a second permanency hearing, on August 24, 2021, the circuit court received reports from the Agency and the GAL regarding Terry's progress in the services. At that point, he had yet to obtain employment or stable housing, and he was living at a friend's house in Elgin. He continued to refuse all efforts to confirm his sobriety, and he repeatedly denied the need for substance abuse services despite a history of drug-related charges and his on-and-off relationship with Kelly, whom the court found was a "repeat relapser." He continued to refuse all of the drug screenings, despite being informed that failing to appear would be considered a positive test result. Throughout the proceedings, he refused to participate in a substance abuse assessment, and, during the relevant nine-month period, he failed to appear for each and every of the required drug screenings. In light of the court's admonition that he needed to comply with the terms of the service plan or risk termination of his parental rights, Terry's explanation that he did not wish to "belittle" or "disrespect" himself by participating in a substance abuse assessment or confirming his sobriety through random drug testing suggests an apathy for the court's proceedings. Moreover, he did not begin the parenting education classes until August 2021, which was after the relevant nine-month period relied on by the State. He thereafter failed to complete the parenting education classes and was thus unable to begin the parenting coaching services. Although he completed anger management services, he did not begin that service until after the relevant nine-

month period alleged by the State, despite having received timely referrals for that service. The Agency report prepared for the termination hearing noted that his service plan required that he "demonstrate an understanding of DCFS involvement, accept accountability and show new identified coping strategies on his anger or frustration." Terry failed to demonstrate these goals by, among other things, being defiant and aggressive with the caseworker, referring to the trial judge in a derogatory manner during a status hearing, refusing to acknowledge that he had a DCFS case, and failing to accept any responsibility for the circumstances in which E.B. came into care.

¶ 52 Based on Terry's failure to substantially fulfill his obligations under the service plan and correct the conditions that brought E.B. into care, the circuit court properly found that he was unfit based on his failure to make reasonable progress toward the return of the minor during the relevant nine-month period. Because his parental rights were terminated based on clear and convincing evidence of this unfitness ground, and any one ground is sufficient, we need not consider the additional grounds cited by the court. *Tiffany M.*, 353, Ill. App. 3d at 891.

¶ 53 We next turn to the question of the best interests of the minors. At this stage of the proceedings, the court "focuses upon the child's welfare and whether termination would improve the child's future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). The statutory factors the court must consider in making a best interest determination are: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of those available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 54    The circuit court's finding that it was in the best interests of the children that Kelly and Terry's parental rights be terminated was not against the manifest weight of the evidence. Neither counsel for Kelly nor Terry identify any issues of potential merit regarding the best-interests finding against them, and we likewise discern no such issues. The court heard testimony from the caseworker, Wykoski, who testified that C.F. was five years old and had bonded well with his maternal uncle, who was willing to provide for him permanently. The home was "very loving," and C.F. had strong ties to the community and lots of friends in the area. He further testified that E.B., who as two years old at the time of the hearing, was in a "loving home," where he had resided since he was only 2 ½ months old, and he called his foster parents, "mom" and "dad." According to Wykoski, E.B.'s foster parents were willing to provide for his needs going forward.

¶ 55    The circuit court's unfitness and best interests determinations were not against the manifest weight of the evidence, and these appeals present no issue of arguable merit. Accordingly, we grant counsels' motions to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 56                             III. CONCLUSION

¶ 57    For the foregoing reasons, we grant counsels' motions to withdraw from representation for respondents in their respective appeals, and we affirm the judgment of the circuit court of Kane County.

¶ 58    Affirmed.