NOTICE
Decision filed 01/21/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250735-U

NOS. 5-25-0735, 5-25-0736, 5-25-0737 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* DI'MAYA S., CHRISTOPHER S. JR., and DE'ANA S., Minors | ) ) ) | Appeal from the Circuit Court of De Witt County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 23-JA-11, 23-JA-12, 23-JA-13 |
| Christopher S., | ) ) | |
| Respondent-Appellant). | ) ) | Honorable Karle E. Koritz, Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's findings that the respondent was an unfit parent, and that the minors' best interests were served by terminating his parental rights, were not against the manifest weight of the evidence, and the court did not err in refusing to grant his motion to continue the best-interest hearing, and since any argument to the contrary would be without merit, this court grants appointed appellate counsel leave to withdraw and affirms the judgment of the circuit court.

¶ 2    After hearings on the State's petitions to terminate parental rights, the circuit court found that the respondent, Christopher S., was unfit to have a child and that it was in the best interests of his biological minor children to terminate his parental rights. The respondent now appeals. His appointed appellate counsel has concluded that this appeal lacks merit, and on that basis counsel has filed a motion for leave to withdraw as counsel, along with an accompanying brief. See *Anders*

1

*v. California*, 386 U.S. 738 (1967), *People v. Jones*, 38 Ill. 2d 384 (1967), and *In re S.M.*, 314 Ill. App. 3d 682, 686 (2000). Counsel mailed the respondent a copy of the *Anders* motion and brief, and this court gave him ample opportunity to file a written response to that motion. He has not filed any type of response. For the reasons that follow, this court affirms the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4      On August 8, 2023, the State filed three petitions for adjudication of wardship in De Witt County case Nos. 23-JA-11, 23-JA-12, and 23-JA-13. The subjects of the three petitions, respectively, were Di'Maya S. (Di.S.) (born November 2020), Christopher S. (C.S.) (born October 2016), and De'Ana S. (De.S.) (born July 2023). The children's father was the respondent, and their mother was Diamond R. (Diamond was a party to the proceedings in the circuit court, and she too had her parental rights terminated, but she is not a party to this appeal.) Each of the three petitions alleged that the minor was neglected in that his or her environment was injurious to his or her welfare. See 705 ILCS 405/2-3(1)(b) (West 2022).

¶ 5      A shelter-care report was filed that same day. It stated that the Department of Children and Family Services (DCFS) had prior involvement with the family from January 2019 to February 2021, for child neglect. The prior case began as an intact-family case, but it became a placement case. The prior case was successfully closed, with the children returned to the respondent and Diamond.

¶ 6      According to the shelter-care report, the current DCFS involvement began on March 5, 2023, when DCFS received a hotline call stating that Diamond, who was pregnant with De.S. at the time, crashed her car into a cornfield, with C.S. and Di.S. unrestrained in the car. For that incident, Diamond was arrested for driving under the influence (DUI). On July 21, 2023, a hotline

2

call stated that the respondent and Diamond were both intoxicated when they had a domestic dispute, which resulted in Diamond's arrest for domestic battery. On August 7, 2023, a child protection specialist (CPS) spoke with a Clinton, Illinois, police officer. The police officer informed the CPS that the police had responded to domestic disputes involving the respondent and Diamond twice during the night of August 6, 2023, and both the respondent and Diamond were intoxicated, with Diamond having bruises on her face and the respondent having an apparent stab wound to his abdomen, though none of the injuries appeared fresh. On August 7, 2023, DCFS took Di.S., C.S., and De.S. into protective custody.

¶ 7    Also on August 8, 2023, the circuit court held a temporary-custody hearing, also called a shelter-care hearing, in all three cases. A guardian *ad litem* (GAL) was appointed for the three minors. The respondent and Diamond were both present with appointed counsel. Based on the shelter-care report, the court found probable cause to believe the minors were neglected. Written temporary-custody orders in the three cases stated that the finding of neglect was based upon the parents' "repeated instances of domestic violence while intoxicated." The court also found an immediate and urgent necessity to remove the minors from the home, and the court gave temporary custody of the minors to DCFS.

¶ 8    The three minors were placed in a fictive-kin foster home, where they remained throughout these proceedings. The placement was overseen by The Baby Fold (Baby Fold), a private agency that contracted with DCFS. Emily Hartman, a child welfare specialist with Baby Fold, was the caseworker throughout these proceedings. Hartman prepared all the service plans and permanency reports in this case, plus the best-interest report at the end of these proceedings.

¶ 9    On September 28, 2023, a service plan dated September 21, 2023, was filed with the circuit court. In regard to the respondent, the service plan noted that he had a pending DUI case from June

3

28, 2023. He did not have a valid driver's license due to a DUI, but he continued to drink. The service plan required the respondent to "complete a substance abuse program and maintain a substance-free lifestyle." He needed to "complete a substance abuse assessment and follow all recommendations," and he needed to submit to random drug screens. The service plan also required the respondent to complete a domestic-violence assessment, to follow all recommendations, and to "live a domestic violence free lifestyle." There were also recommendations as to mental-health counseling and parenting skills, including a parenting class. Subsequent service plans were also filed; their recommendations were in line with those in his first plan.

¶ 10    Also on September 28, 2023, an integrated assessment (IA) was filed with the circuit court. The IA was prepared by Tamica Hatchett, LCSW, and Hartman of Baby Fold. In regard to the respondent, the IA stated: "Concerns were noted that [the respondent] has had DCFS involvement since 2019 due to ongoing problems with his parenting and ability to provide a safe environment for his children including intimate partner violence in the home and alcohol abuse in the home." In regard to the respondent's ability to provide for the safety and well-being of his children, the "primary concerns" were "his chronic alcohol abuse and perpetration of intimate partner violence in his relationship with [Diamond]." The respondent "minimized or denied" his problems, which caused "concerns regarding his readiness to engage in change and genuine engagement in services." The IA advised treatment providers to "assess [the respondent's] progress in treatment and not just his participation." The IA noted that he had weekly supervised visits with the children, but he was "not consistently participating in visitation."

¶ 11    Also on September 28, 2023, the circuit court entered adjudicatory orders in the three minors' cases. The court found that the three minors had been neglected in that their environment

4

was injurious to their welfare. This finding was based upon (1) Diamond's committing DUI while children were in the vehicle and unrestrained, and (2) domestic violence between the respondent and Diamond while children were present.

¶ 12    On October 26, 2023, the circuit court held a dispositional hearing in the three minors' cases. All parties, and the GAL, agreed that the goal should be to return the children home within 12 months, and they all agreed that wardship was appropriate. The court made all three minors wards of the court and awarded guardianship to DCFS. The court entered written dispositional orders in the three cases.

¶ 13    The first permanency report in these cases was filed with the circuit court on March 21, 2024. According to the report, neither the respondent nor Diamond had made substantial progress in services, and "there have continued to be concerns of ongoing substance use and domestic violence."

¶ 14    On April 4, 2024, the circuit court held its first permanency-review hearing in the three cases. Transcripts of the permanency-review hearings are not included in the record on appeal. The court entered written permanency orders in the three cases. The court found that neither the respondent nor Diamond had made reasonable and substantial progress, or even reasonable efforts, toward returning the minors home. The permanency goal remained return to home.

¶ 15    The second permanency report was filed with the circuit court on July 25, 2024. According to the report, the respondent and Diamond had become "more engaged in services and more consistent with visitation" since the hearing of April 4, 2024. The respondent had taken a parenting class from April to June 2024, and had passed. However, there had been "continued substance abuse and police involvement." Baby Fold had "concerns" that the parents would be able to stabilize their situation to a point that was "conducive to raising children free from harm." There

5

were also "concerns" that the respondent was "continuing to use alcohol, and although it is a legal substance, it has been a precursor to domestic violence incidents and police involvement for [the respondent]." There were doubts about both parents' "level of engagement with services." The two appeared to be "going through the motions of services and doing what they believe is required." However, the permanency report cautioned that "in order for the children to be safely returned home, there need to be changes in [the respondent's and Diamond's] behaviors and habits. The continued police involvement and substance use are barriers in the children being returned home."

¶ 16     On July 29, 2024, the State filed petitions to terminate the parental rights of the respondent and Diamond in regard to each of their three children. The petitions alleged that during the nine-month period from October 27, 2023, through July 26, 2024, both parents failed to make reasonable efforts to correct the conditions that formed the basis for the removal of the children and failed to make reasonable progress toward the return of the children.

¶ 17     On August 1, 2024, the circuit court entered written permanency orders in the three cases. The court changed the permanency goal to substitute care pending determination of termination of parental rights; the goal was changed because of the State's filing a petition to terminate parental rights. As to the respondent, the court found that he had made reasonable efforts, and reasonable and substantial progress, toward returning the minors home.

¶ 18     On September 26, 2024, the circuit court held a hearing on the State's petitions to terminate parental rights, specifically, on the issue of parental unfitness. The State called three witnesses—Diamond, the respondent, and Hartman from Baby Fold.

¶ 19     The respondent testified that someone had reviewed the service plan with him and had let him know what he needed to do in order to have his children returned to him, but as he recalled,

6

that explanation was not provided to him until April 2024. According to the respondent, from August 2023 to April 2024, nobody explained what he needed to do in order to have his children returned. For example, nobody told him until April 2024 that he needed to do substance-abuse treatment or that he needed to stop drinking. The respondent acknowledged that he had two DUIs in De Witt County, one in 2017 and one in 2023, although the 2023 incident stemmed from marijuana use. Under cross-examination by the GAL, the respondent acknowledged that C.S. had been taken from his care twice, and that the reason for his removal was "alcohol." The respondent denied any domestic violence. "Just verbal—verbal assault," he testified.

¶ 20    Hartman testified that she met with the respondent and Diamond, separately, on September 22, 2023. It was on that date that Hartman reviewed the service plan with each, explained the service plan, and provided each with a copy. Both the respondent and Diamond indicated an understanding of what he or she needed to do. In the service plan, there is a specification that the respondent "live a substance-free lifestyle," Hartman continued, and therefore the respondent was told that he needed "to not use substances." On September 28, 2023, Hartman filed the service plan with the court. Under cross-examination by the respondent's attorney, Hartman testified that when the case was first opened, she had informed the respondent of "our expectation that he does not drink."

¶ 21    After hearing arguments, the circuit court found that the State had failed to meet its burden of proving that the respondent and Diamond were unfit to have a child. The court denied the petitions to terminate parental rights. The court set a permanency goal of return home within 12 months.

¶ 22    The third permanency report was filed on January 17, 2025. According to that report, the parents' behavior had not changed significantly since the children came into care, and "[Baby

7

Fold] believes that, at this time, if the children were to return home, there is a high possibility that they would enter care again." During this reporting period, both the respondent and Diamond had "tested positive for high amounts of alcohol" during their weekly drug screens. "[Caseworker Hartman] also knows that the police have been called to their residence while they were under the influence of alcohol." On January 3, 2025, Hartman met with the respondent so that he could sign consent forms that would allow her to re-refer him for substance-abuse treatment. "He signed the consents but stated that he does not need treatment." On November 12, 2024, the respondent completed treatment for domestic violence. He continues to state that he has never committed domestic violence and never has been arrested for it. However, the permanency report stated that "[Baby Fold] has observed many incidents, over the phone, at visits, at court, where [the respondent] has been verbally aggressive, demeaning, and controlling to Diamond, which are all forms of domestic violence." His refusal to acknowledge domestic violence, according to the report, is viewed as "an indicator that if the children were to be returned home, another incident would occur." During visits with their children, both parents had shown an inability to control their tempers and to provide for the children's needs.

¶ 23    The third permanency report also related an account of the first parent-child visit after October 31, 2024. A case aide had arrived with the children at the parents' house. The parents apparently thought that a visit occurring at their house would be unsupervised, and they were surprised to learn that the visit would actually be supervised by the case aide. "They then became very escalated in front of the children," the permanency report continued. "The visit ended early, and the case aide stated that [she] no longer felt comfortable supervising visits." That night, both parents called Hartman three times, stating that they wanted a new caseworker. During one call, the respondent "made a comment about how a DCFS worker was killed when doing a home visit.

He stated that he would never do that, but that he 'would do anything for his kids.' " The permanency report concluded by noting that the current case had been opened "due to multiple incidents of domestic violence where at least one parent was drinking." In the view of Baby Fold, the respondent and Diamond, despite treatment, continue with domestic violence and substance use, and continue to "minimize their substance use and deny that there were ever incidents of domestic violence."

¶ 24    On January 23, 2025, the circuit court entered permanency orders in the cases. The court found that both the respondent and Diamond had made reasonable efforts toward returning the minors home, but that neither parent had made reasonable and substantial progress toward that end. The court set a permanency goal of return home pending status hearing.

¶ 25    The fourth permanency report was filed on June 26, 2025. The permanency report had attachments including a spreadsheet summarizing parental visits with the children and a spreadsheet summarizing the respondent's drug screens. The permanency report stated that Baby Fold "does not believe that either parent has made any progress during this reporting period." Although both the respondent and Diamond had completed their domestic violence treatment, "there have been additional incidents with police during this reporting period. There has been continued alcohol use for both parents despite being re-referred for substance use treatment." The respondent did not believe that he needed substance-abuse treatment or that he needed to make any changes. His attendance at visits with the children had been inconsistent during the reporting period, "citing that his allergies are acting up or that he doesn't feel well." When the respondent did visit, he was "critical of Diamond and the children" and spoke "negatively" about the children's "emotions and behaviors." He never asked the children questions about their activities since the last visit. The safety concerns that had resulted in the children's being brought into care were "still

prevalent in this case" and caseworker Hartman had not observed the respondent "demonstrate an ability to care for the children day to day or on his own."

¶ 26 On July 2, 2025, the State filed, for the second time, petitions to terminate the rights of the parents in their three children. The petitions alleged that each parent was unfit to have a child because, during the nine-month period from October 2, 2024, through July 2, 2025, a period after the adjudication of neglect, each had failed to make reasonable progress toward the return of the minors. See 750 ILCS 50/1(D)(m)(ii) (West 2024). The petitions also alleged other statutory grounds for unfitness, but those need not be described here. The petition also alleged that terminating each parent's parental rights was in the best interest of each child.

¶ 27 On July 3, 2025, the court entered written permanency orders in the three cases. The court changed the permanency goal to substitute care pending determination of termination of parental rights. The court found that both the respondent and Diamond had made reasonable efforts toward returning the children home, but neither had made reasonable and substantial progress toward that end.

¶ 28 On July 23, 2025, the circuit court held a hearing on the State's petitions for termination of parental rights, specifically, on the issue of parental unfitness. Both the respondent and Diamond were present with their respective attorneys.

¶ 29 The fitness hearing began with the State's offering into evidence 15 police reports from July 31, 2024, to July 12, 2025. Without objection, the court admitted them into evidence.

¶ 30 The 15 police reports, all from the Clinton Police Department, described police interactions with the respondent, with Diamond, or with both. Generally, these interactions were at the Clinton, Illinois, house that the two of them shared. The police reports described contacts on July 31, 2024; August 9, 2024; November 7, 2024; November 26, 2024; January 24, 2025; February 28, 2025;

10

March 4, 2025; April 24, 2025; April 25, 2025; May 14, 2025; June 3, 2025; June 19, 2025 (two reports); July 1, 2025; and July 12, 2025. Of those 15 reports, all of them, except for the first two and the last one, were within the relevant nine-month period set forth in the State's petitions to terminate parental rights.

¶ 31    Here follows a brief summary of 7 of those 15 police reports, all from within the nine-month period. On November 7, 2024, police officers arrived at the respondent and Diamond's residence. The two were arguing, and the respondent stated that he merely wanted the police to "scare" Diamond and to "talk sense" into her so that a physical altercation did not develop.

¶ 32    The police report dated January 24, 2025, stated that at approximately 1:30 a.m., officers arrived at the house. They found the respondent-father standing in the front doorway. He was yelling about Diamond waking him from his sleep.

¶ 33    The police report dated February 28, 2025, stated that officers arrived at the house and spoke with the respondent. He stated that sometime earlier, he and his friend, Jasper Powell, were at the respondent's house, "arguing about a woman." The argument became intense, and Powell threatened to beat up the respondent. Then, the respondent pulled a knife, and he told Powell that he would, "Put his tires on flat." Powell departed. An hour later, Powell returned, and the respondent let him into the residence. Shortly afterward, Powell removed a handgun from a pocket and pointed the gun at the respondent. When Powell pointed the gun at the respondent's face, the respondent "smacked" the gun away. Powell put the gun back in his pocket and left the house. The police subsequently located Powell at his own Clinton residence and arrested him for aggravated assault. Police also found two handguns in Powell's car.

¶ 34    The police report dated March 4, 2025, stated that officers arrived at the house, and they found the respondent covered in mud and "very intoxicated." A neighbor told police that the

11

respondent, whom he did not know, appeared at his house in a drunken state and fell into the mud in the neighbor's yard, knocking over a trash can. Police saw that a trash can had been knocked over in the yard, and the respondent's hat was found near the trash can.

¶ 35   The police report dated April 24, 2025, stated that at approximately 8:45 p.m., an officer was dispatched to the house to investigate a disturbance. Observing Diamond walking near the house, the officer stopped her, and he smelled a strong odor of alcohol on her breath. Diamond told the officer that the respondent had locked her out of the house and would not let her back inside, even though her name was on the lease. The respondent could be heard yelling from inside the house. The officer knocked on the door, and the respondent answered. By way of explanation, he told the officer that he did not want Diamond in the house because she had disrespected him. The officer explained that he could not simply lock Diamond out of the house. Diamond remained at the house that night.

¶ 36   The police report dated June 3, 2025, stated that officers took a neighbor's complaint about the respondent allegedly trespassing on his property. An officer observed the respondent arguing with a woman in a nearby alleyway.

¶ 37   The police report dated June 19, 2025, stated that at approximately 1:30 a.m., officers were dispatched to the house on a report of criminal damage to property. Upon arrival, an officer observed Diamond standing outside. Diamond stated that the respondent was abusive. The respondent came out of the house and said that Diamond had broken a window of the house with her hand. The house had a broken window. The respondent said that Diamond was "mad because he was talking to other women." Diamond's hand was bleeding, and she admitted to an officer that she had broken the window.

12

¶ 38　With the 15 police reports admitted into evidence, the State then called Diamond to testify. Diamond was the State's sole in-person witness at the unfitness hearing. In fact, she was the only person to testify live, for anyone, at the unfitness hearing.

¶ 39　Diamond testified that she and the respondent had been dating for nine years. They lived together that whole time, and they continued to live together. Acknowledging that the police had been called to their residence on numerous occasions, Diamond testified that the police always assumed that she and the respondent were intoxicated because, during prior incidents, they had been. She said, "I feel like it's a label at this point." She and the respondent consumed alcohol "[o]ccasionally, to be feelin' good, maybe wanna celebrate, maybe it's our birthday." She estimated that the two of them drank together "like, ten times per month," and during their nine years together, that had been their pattern. Diamond stated that she "really can't afford to do a lot of drinkin' like people think I do." During the pendency of this case, she had "slowed down" on her alcohol consumption. At present, she and the respondent "live in the same household," and they "try to work with each other to get things done," but "sometimes it just seems like it don't work no way 'cause we disagree with each other." When they disagree, and they have been drinking, "that's when the police incidents occurred."

¶ 40　During cross-examination by the GAL, Diamond recalled the incident involving the respondent and his friend, Jasper Powell. (This incident was the subject of the police report dated February 28, 2025.) Diamond testified that she and the respondent were at home when Powell came inside their house. They thought that Powell was going to "continue talkin' or whatever," but instead he pulled a gun from his clothing and pointed it toward the respondent, and then toward her. Diamond and the respondent tried to get Powell "out of the house," and Powell left the house. "[T]hen [the respondent and Powell] were going back and forth for a moment," and Diamond

13

attempted to stop them from "going at each other." Powell "went his way," and the respondent "came back in the house pretty upset about it." Diamond was also upset because she "never had anything like that" happen to her.

¶ 41 At the State's request, the court took judicial notice of its prior orders—specifically, of its permanency orders, its dispositional order, and its adjudicatory order—and "findings and the grounds for those findings as set forth in those orders." The parties stipulated that if Emily Hartman were to testify at the hearing, her testimony would be consistent with her testimony at the first unfitness hearing and with all the permanency reports that she had authored and filed in the minors' cases. None of the other parties presented witnesses or other evidence.

¶ 42 During his argument, the respondent's attorney reviewed the police reports that had been admitted into evidence, and counsel stated that only one report clearly described the respondent as being under the influence of alcohol. As for Diamond's testimony about Jasper Powell, counsel stated that Powell was arrested and charged for his criminal act, and counsel suggested that the police and the State viewed the respondent as the victim in that incident. It would be wrong, counsel suggested, to view the Powell incident as evidence of the respondent's unfitness to have a child. Counsel asked the court to find that the State had failed to prove the respondent unfit.

¶ 43 The GAL, in his own argument, stated that "[w]e're almost two years into this case," and the respondent and Diamond still do not understand the gravity of the case. After all this time, the GAL argued, the parents were not any closer to "overcoming their problems with alcohol that causes huge issues with domestic violence and raising their children."

¶ 44 After hearing argument, the circuit court recessed briefly in order to review the police reports that it had admitted into evidence. Afterward, the court recapitulated several of those reports. The court commented, "I don't know that there's five other households in DeWitt County

14

where the police are dispatched more often than they are to [the parents'] home." The court thought that the reports demonstrated "terrible" decision-making by the parents, and "the primary concern for any court is going to be if the children are returned to the care of the parents, are they going to make good decisions." The court noted that the first termination proceeding in this case occurred in September 2024, 10 months prior to the current unfitness hearing, and the court commented that despite the passage of those 10 months, "we're no closer to return home than we were in September of 2024." The court found that the minors' environment was "every bit as injurious" as it was when the petitions for adjudication of wardship were filed two years earlier, "and that's not likely to change in the near future." Despite sympathy for the parents' situation, the court concluded that the State had proven by clear and convincing evidence that both parents had failed to make reasonable progress for the minors' return home in the nine-month period alleged in the State's petitions. The court found that the State had failed to prove the other grounds for unfitness. The court then ordered Baby Fold to prepare and file a best-interest report. The court scheduled a best-interest hearing for September 4, 2025, at 1:30 p.m., and it adjourned court for the day. Also, the court entered written orders finding that the respondent and Diamond were unfit to have a child.

¶ 45    A best-interest report was filed on August 18, 2025. The children, who were 8, 4, and 2 years old at the time, had been in foster care, with the same married couple, since August 2023. During twice-monthly visits at the foster home, caseworker Hartman had observed that the foster parents met all of the children's individual needs. C.S., who was eight years old, had started on ADHD medication and was receiving mental-health treatment. Di.S., age four, was in mental-health treatment, had recently completed an occupational-therapy assessment, and was recommended for treatment. De.S., age two, was completely normal in her development. All of the children were happy and bonded with their foster parents. "This foster home provides [all three

15

children] with stability, security, healthy attachment and a loving environment that encourages them to develop while protecting them from harm." Furthermore, the foster parents have expressed their desire to provide the children with a permanent home.

¶ 46    Meanwhile, according to the best-interest report, the respondent had been "very inconsistent" with his visits, and he had not demonstrated an ability to care for the children. "[The respondent] completed his parenting class and domestic violence class but has not implemented any of the skills taught in his daily life," the report stated. "He also continues to state that he does not need to change anything about himself or his behaviors. *** There have been times throughout this case where [the respondent] has been aggressive, threatening, and uncooperative with [Baby Fold]." Baby Fold recommended that the three children remain in their current placement.

¶ 47    On September 4, 2025, at 1:30 p.m., the circuit court called the case for a best-interest hearing. Diamond was present for the hearing, with her counsel. The respondent was not present, but his attorney informed the court that the respondent had phoned his attorney at the office "at around 12:30" and had "reported being ill and unable to attend court," and he asked counsel to request a continuance. Counsel moved for a continuance on the respondent's behalf. The State objected on the grounds that the respondent had received in-court notice of the hearing and a continuance would only "delay permanency" for the children. The court denied the respondent's motion for a continuance. Later in the hearing, the court noted that "[t]here's been no documentation" of the respondent's illness, and the court commented that it was "not confident at all in the truthfulness of his motion."

¶ 48    After denying the respondent's continuance motion, the court inquired of the State whether it had any additions or corrections to the best-interest report. The State answered in the negative. The court stated that it would "consider that report subject to counsel's right to cross-examine,"

16

and the court asked the State whether it had "[a]ny further evidence." The State again answered in the negative, adding, "We're gonna stand on the report." Turning to the respondent's attorney, the court asked whether he had any evidence, and counsel answered that he would briefly call caseworker Hartman.

¶ 49 Respondent's counsel's questioning of Hartman focused exclusively on the spreadsheet summarizing parental visits with the children, which Hartman had attached to the permanency report she had filed on June 26, 2025. This spreadsheet noted whether a scheduled visit had or had not occurred, and the reason for a visit's not occurring. Counsel asked Hartman about 19 dates— from October 24, 2023, to April 9, 2025—when scheduled visits did not occur. Hartman testified that on those 19 dates, the scheduled visits did not occur on account of the unavailability (due to sickness, etc.) of a Baby Fold employee to supervise the visit, or because of some other circumstance that was beyond the parents' control.

¶ 50 On cross-examination by the State, Hartman testified that apart from those 19 visits, the respondent and Diamond were inconsistent with their visits with the children. Hartman explained that sometimes, the respondent would cancel visits because he was not feeling well, or he would not attend a visit but Diamond would attend. Sometimes, the respondent and Diamond would not confirm a visit the day before. Sometimes, Baby Fold "canceled visits based off of their behavior," for example, if one of the two was arrested or "there was a domestic violence incident." No witnesses other than Hartman were called to testify at the best-interest hearing.

¶ 51 Following arguments by the parties, the circuit court stated that it had considered the sworn testimony presented at the hearing, the arguments of counsel, and the best-interest report. The court commented that "a number" of the missed visits "were not the parents' fault," but "the parents were responsible for a number of other missed visits and/or cancellations." Even when visits did

take place, they were "oftentimes problematic" due to the parents' behavior. Considering the statutory best-interest factors, the court thought that "the three biggest points" were that (1) the children were "thriving" in their current placement, "much more so" than at home with their parents; (2) the children have "a much brighter future and avenue for happiness and safety and security" in their current placement, as opposed to living with their parents; and (3) if the court were to return the children to their parents, or find that it was not in their best interest that parental rights should be terminated, "they would remain in care for a significant period of time." The court expressed its belief that if it were to return the children to their parents, "we would be back here in short order with the same kind of allegations, the same kind of evidence." The court ruled that the State had proven, by a preponderance of the evidence, that it was in the best interest of the children that parental rights be terminated.

¶ 52    The circuit court entered written orders finding that it was in the best interests of the three minors, and of the public, that the parental rights of the respondent and Diamond be terminated. DCFS was granted the power to consent to the three minors' adoption.

¶ 53    On September 5, 2025, the respondent-father filed a timely notice of appeal from the orders finding him unfit and terminating his parental rights. The circuit court appointed appellate counsel for the respondent.

¶ 54                                    II. ANALYSIS

¶ 55    Counsel for the respondent has accompanied his *Anders* motion with a brief presenting three potential issues for review. Those issues are (1) whether the circuit court's finding that the respondent was unfit was against the manifest weight of the evidence; (2) whether the circuit court's finding that the best interests of the children required terminating the respondent's parental rights was against the manifest weight of the evidence; and (3) whether the circuit court abused its

18

discretion, or violated due process, when it denied the respondent's motion to continue the best-interest hearing. As previously noted, the respondent has not filed a response to the *Anders* motion.

¶ 56   Parents have a fundamental liberty interest in the care, custody, and management of their children. See, *e.g.*, *In re D.T.*, 212 Ill. 2d 347, 363 (2004). Nevertheless, the circuit court has the authority to terminate parental rights involuntarily. The involuntary termination of parental rights under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *M.I.*, 2016 IL 120232, ¶ 20; see also *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness"). Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *C.W.*, 199 Ill. 2d at 217.

¶ 57   If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor to terminate parental rights. *D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the circuit court's focus shifts to the best interests of the child and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. A prompt, just, and final resolution of a child's status, as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 58   A reviewing court accords great deference to the circuit court's decisions in termination proceedings because the circuit court is in a better position to observe witnesses and to judge their

19

credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the circuit court's finding of parental unfitness or the child's best interest is against the manifest weight of the evidence, this court will not disturb that finding. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 59    In this case, the State alleged, and the circuit court found, that the respondent was unfit to have a child because he had failed to make reasonable progress toward the return of the minors during the nine-month period from October 2, 2024, through July 2, 2025, a period that was after the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is judged by an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The "benchmark" for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent has made reasonable progress when the trial court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 60    Abundant evidence clearly and convincingly supports the circuit court's conclusion that the respondent did not make reasonable progress during the nine-month period from October 2,

20

2024, through July 2, 2025. The record shows that the children came into care in August 2023 largely because of their parents' consuming alcohol and becoming involved in domestic disputes while under the influence of alcohol. The respondent's service plans required him to complete substance-abuse and domestic-violence treatment and to live a "lifestyle" free of substances and domestic violence. From the early days of this case, the respondent "minimized or denied" his problems, according to the integrated assessment. His minimization or denial continued throughout this case. As made clear by the spreadsheet summarizing the respondent's drug screens, which was attached to the fourth permanency report, the respondent failed to appear for his weekly drug screens on 12 occasions, and he tested positive for alcohol on 3 occasions, during the relevant nine-month period. (In addition, on five occasions during that period, he tested negative, but a spreadsheet notation indicated that "specimen was dilute.") According to a police report from March 4, 2025, when Clinton police arrived at the parents' house, they found the respondent covered in mud and "very intoxicated." According to Diamond's testimony at the unfitness hearing on July 23, 2025, she and the respondent consumed alcohol together "ten times per month," and this had been their pattern during their nine years together. During the relevant nine-month period, the police arrived at the parents' house approximately one dozen times, mostly to address domestic disputes between the respondent and Diamond. On February 28, 2025, there was a disturbing incident in which the respondent became involved in a heated argument with a friend, which led to the friend's pointing a gun at him.

¶ 61    In addition, the respondent's visitation with his children was inconsistent during the nine-month period. Caseworker Hartman stated in her fourth permanency report that the respondent missed some visits entirely, and when he did appear for visits, he oftentimes criticized Diamond and the children. Spreadsheets summarizing the parent-child visits confirmed these statements.

21

The spreadsheets also showed that the respondent, during visits, yelled at the children, was distracted by his cell phone, and acted belligerently toward the case aide who supervised the visits.

¶ 62    All of the evidence at the unfitness hearing, taken together, shows clearly and convincingly that the respondent and Diamond created a chaotic and combative environment all around them. As caseworker Hartman noted in her fourth permanency report of June 26, 2025, the safety concerns that had resulted in the minors being taken into custody were "still prevalent in this case." The circuit court found that the environment created by the respondent and Diamond was "every bit as injurious" as it was when the petitions for adjudication of wardship were filed two years earlier. The court also found that the current situation was "not likely to change in the near future." Given the evidence adduced at the unfitness hearing, the finding of unfitness was not against the manifest weight of the evidence. This court will not disturb the finding that the respondent was unfit to have a child.

¶ 63    The second step in the involuntary termination of parental rights under the Juvenile Court Act is determining whether the best interest of the child requires such termination. When determining whether termination is in the child's best interest, the circuit court must always keep the child's age and developmental needs in mind, and it must consider these statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to

substitute care; and (10) the preferences of the persons available to care for the child, including willingness to provide permanency to the child. 705 ILCS 405/1-3(4.05) (West 2024).

¶ 64 The evidence showed that the three minors, at the time of the best-interest hearing, had been in the care of the same married foster parents for two years, that is, since they entered care. The foster parents had been providing each of the children with everything necessary to meet their own particular needs, and the foster parents were willing to provide the children with a permanent home. In the words of the best-interest report, the foster parents and the children "have become a family and all love and support one another very much." In contrast, the respondent had not shown an ability to care for the children. He had not done anything to show that he had taken the lessons learned in his parenting classes and his domestic-violence classes and applied them to his own life. Many of the domestic-abuse calls to the police had stemmed from the biological parents' consumption of alcohol, and the respondent continued to consume alcohol. Apparently, the respondent had not changed in any material way in the course of these proceedings, and furthermore, he did not feel that he needed to change anything about himself or his behavior.

¶ 65 In short, the foster parents offered the children a stable and loving home life, while the respondent offered them a turbulent and injurious environment. By a preponderance of the evidence, the State proved that it was in the best interests of the minors to terminate the respondent's parental rights. The circuit court's finding of best interests was not against the manifest weight of the evidence, and therefore this court will not disturb its finding.

¶ 66 Finally, the respondent's appointed appellate counsel, in his *Anders* brief, raises the potential issue of whether the circuit court abused its discretion, or violated due process, when it denied the respondent's motion to continue the best-interest hearing in his absence. Counsel argues that the court did not abuse its discretion or violate due process in doing so.

23

¶ 67    A parent has a fundamental liberty interest, protected by the due process clause of the fourteenth amendment, in maintaining a parental relationship with his or her child. *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999). In actions to involuntarily terminate their parental rights, parents are entitled to certain due process safeguards. *D.R.*, 307 Ill. App. 3d at 482. These safeguards include the right to be present, to be heard, to present evidence material to the proceedings, and to cross-examine witnesses. *D.R.*, 307 Ill. App. 3d at 482; 705 ILCS 405/1-5(1) (West 2024). Due process also requires adequate notice to a parent in a juvenile proceeding. *In re C.L.T.*, 302 Ill. App. 3d 770, 778 (1999). Although a parent has the right to be present at a hearing to terminate parental rights, his presence is not mandatory, and the circuit is not obligated to wait until he chooses to appear. *C.L.T.*, 302 Ill. App. 3d at 778. The respondent does not have an absolute right to a continuance in a proceeding under the Juvenile Court Act. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31. Furthermore, the trial court does not deprive the respondent his right to due process by conducting a termination hearing in his absence. *S.W.*, 2015 IL App (3d) 140981, ¶ 34. Whether to grant or deny a motion to continue in a proceeding under the Juvenile Court Act is a matter within the circuit court's discretion. *C.L.T.*, 302 Ill. App. 3d at 778. This court will not overturn the circuit court's decision absent manifest abuse or palpable injustice. *S.W.*, 2015 IL App (3d) 140981, ¶ 31.

¶ 68    Here, the respondent had received in-court notice of the best-interest hearing approximately six weeks beforehand, while attending the unfitness hearing. The motion to continue was made as the best-interest hearing was starting, by the respondent's counsel on behalf of the respondent. Counsel stated that the respondent had telephoned him at his office, approximately an hour before the best-interest hearing, to say that he was ill and could not attend. As the circuit court noted, there was no documentation to support the claimed illness. Given those

circumstances, the circuit court did not abuse its discretion, and did not violate due process, when it declined to continue the best-interest hearing.

¶ 69                                    III. CONCLUSION

¶ 70    The circuit court's findings of parental unfitness and the children's best interests were not against the manifest weight of the evidence. Also, the circuit court did not abuse its discretion in denying the respondent's motion to continue the best-interest hearing. Any contrary argument would lack merit. Accordingly, this court grants the respondent's appellate counsel leave to withdraw and affirms the circuit court's judgment terminating the respondent's parental rights.


¶ 71    Motion granted; judgment affirmed.